**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL NO.:_____**

| | |
|---|---|
| JAMES BLACKMON, a/k/a Jimmy Andrew Underwood, by and through his GUARDIAN OF THE ESTATE, PAUL TRUETT CANADY, II,<br><br>Plaintiff,<br><br>v.<br><br>JAMES HOLDER, in his individual capacity, ANDREW MUNDAY, in his individual capacity, and the CITY OF RALEIGH,<br><br>Defendants. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff JAMES BLACKMON, a/k/a Jimmy Andrew Underwood, by and through his Guardian of the Estate, PAUL TRUETT CANADY, III, and his attorneys Rudolf Widenhouse, hereby complain of defendants and allege as follows:

<u>**INTRODUCTION**</u>

1.     James Blackmon, a/k/a Jimmy Andrew Underwood (hereinafter "Blackmon" or "James Blackmon") spent 35 years, 8 months, and 15 days in prison for a crime he did not commit.

2.     No physical evidence connected Blackmon to the crime.  His fingerprints did not match the crime scene fingerprints.  He did not match the physical description of the killer provided by several eyewitnesses.  The only eyewitness to be shown his photograph or to view him in a live lineup twice affirmatively excluded him as the person she saw fleeing the crime scene. There was no evidence he was even in North Carolina at the time of the crime.  The defendants had records proving that Mr. Blackmon was in

upstate New York a month before and five weeks after the murder, that he could not drive a car, and there was no evidence he had travelled from upstate New York to Raleigh, North Carolina during that time. The only evidence against Blackmon were false inculpatory statements he made that were the product of the defendants' intentional and deliberate exploitation of his severe mental illness, delusional disorder, and intellectual disability.

3.    Blackmon's nightmare finally ended in January, 2019, when he was exonerated after an investigation by the North Carolina Innocence Inquiry Commission ("NCIIC" or "Innocence Commission") and the unanimous vote of a three-judge panel that he was factually innocent.

4.    The NCIIC is an agency of the State of North Carolina.  It was created by the North Carolina General Assembly in 2006.  "It is charged with providing an independent and balanced truth-seeking forum for credible post-conviction claims of innocence in North Carolina."  https://innocencecommission-nc.gov/about/.

5.    Since its formation, NCIIC has received 2849 claims from individuals seeking relief from their convictions.  https://innocencecommission-nc.gov/about/ (last visited September 21, 2020).  Of those nearly 3,000 case reviews by NCIIC of individuals claiming their innocence, less than ½ of 1% have been exonerated.  James Blackmon was one of them. *Id.*

6.    On March 7, 2012, the NCIIC received a request from Mr. Blackmon's counsel to review his claim that he did not commit the second degree murder of Helena Payton, the offense for which he had been convicted and sentenced to life imprisonment on January 14,1988.

2

7.     Acting on that request, over a six-and-a-half-year period NCIIC staff members conducted an investigation culminating in a three-day hearing before the Innocence Commission from November 14-16, 2018.  The NCIIC investigation included numerous witness interviews, the collection and review of thousands of pages of documents, the retention of expert witnesses, and the forensic testing of the available evidence.[1]

8.     At the conclusion of the three-day hearing the Innocence Commission voted unanimously that there was sufficient evidence of factual innocence to merit judicial review.  The Innocence Commission referred the case to the Chief Justice of the North Carolina Supreme Court for the appointment of a three-judge panel of North Carolina Superior Court judges to conduct a hearing on Mr. Blackmon's allegation of factual innocence.

9.     The three-judge panel hearing was held in Wake County on August 20-22, 2019.  At the end of the hearing, the three-judge panel unanimously concluded that Mr. Blackmon had proven by clear and convincing evidence that he was factually innocent of Helena Payton's murder.

Factual Overview

10.     Helena Payton was a student at St. Augustine's College ("St. Aug's") in Raleigh.  At around 6:10 a.m. on the morning of September 29, 1979, she left her dorm room on the 6th floor of Latham Hall, an all-female dorm on campus, to use the bathroom. Within a minute of leaving her room, she was attacked inside the bathroom by a man

_____

[1] The NCIIC staff learned in its investigation that all of the physical evidence in the case, other than a card bearing latent fingerprints developed from the crime scene, was missing and could not be accounted for by either the Raleigh Police Department, the City-County Bureau of Investigation, the State Bureau of Investigation, or the Wake County Superior Court Clerk's Office.

3

wielding a knife.  She was severely cut once in the neck.  Ms. Payton died in the hospital from her wound a little more than a month later.

11.     Ms. Payton did not know her attacker.  She had never seen him befoe in her dorm, on campus, or anywhere else.

12.     Awakened by Ms. Payton's screams, several of the women living on the 6th floor of Latham Hall opened the doors of their rooms in time to see a man walking away from the bathroom, down the hallway, and out the stairway exit on the east side of the building.  One witness, Jackie Kelly, saw the man walk right past her on his way out.

13.     On the day of the attack James Hardy of the Raleigh Police Department ("RPD") processed the crime scene, which included lifting latent fingerprints from the door of the bathroom stall where Ms. Payton was attacked.

14.     The knife used in the crime was found in a lounge area on the first floor of Latham Hall.  In RPD reports the knife is described as having a wooden handle and a 4-7/16" folding blade.

15.     Over the ensuing months and years, despite investigating numerous suspects; receiving and following-up on several tips regarding the identity of Helena Payton's killer; having multiple eyewitnesses, including Ms. Kelly, view several photographic arrays of possible suspects as well as live lineups; comparing the fingerprints of numerous suspects to the prints developed from the crime scene; and employing the assistance of a psychic, RPD was unable to solve the crime.

16.     On February 3, 1981, eighteen months after the crime, the RPD's Major Crimes Task force met to discuss the unsolved murder of Helena Payton.  Defendants Holder and Munday were both members of the Major Crimes Task Force.  At some point

4

during or following that meeting, but no later than January 18, 1982, Holder and Munday were assigned to take over and lead the investigation into Ms. Payton's unsolved murder.

17.     On February 8, 1983, some three and a half years after Helena Payton was killed, Raleigh Police Detective N.S. Lockey received a tip from an unidentified person at Dorothea Dix Hospital ("Dix"), a state psychiatric hospital, that a black man who was a patient at Dix had bragged about killing women in New York, New Jersey, and Raleigh.

18.     This tip from a person at Dix was passed along from Lockey to defendants Holder and Munday.  Lockey provided no information to Holder or Munday that he knew this person was credible, or that he had provided reliable information in the past.

19.     Lockey was told, through a second anonymous tip, that James Blackmon, who was involuntarily committed to Dix at the time, allegedly fit the description provided by his first Dix informant.  Once again, Lockey provided no information to Holder or Munday that he knew this person was credible, or that he had provided reliable information in the past.  After receiving this unverified information from Lockey, Holder and Munday focused their investigation solely on Blackmon.

20.     On February 24, 1983, the City-County Bureau of Investigation ("CCBI") reported that it performed a fingerprint comparison between Blackmon's prints and the latent prints lifted from the bathroom stall door where Helena Payton was attacked.  The prints did not match.

21.     RPD requested and received records from various institutions in New York State at which James Blackmon had received psychiatric diagnoses, including prisons where he had been incarcerated and treated in psychiatric units.  These records revealed that Blackmon had been diagnosed with severe mental illnesses, including diagnoses of

5

schizophrenia, organic brain syndrome, and delusional thinking. There was also testing that revealed him to have significant intellectual disability (referred to in the records at the time as "mental retardation" or "mentally defective").

22. Holder and Munday also obtained Blackmon's medical records from Dix. The Dix records revealed, among other things, diagnoses of paranoid schizophrenia and delusional thinking, which included stating that God and Satan were his fathers, that he could cause floods and earthquakes, and that he was going to marry the singer Diana Ross. He was reported to have a full scale WAISR IQ of 69, indicating "mild mental retardation."

23. The New York records revealed that on August 24, 1979, little more than a month *before* Helena Payton was attacked in Raleigh, Blackmon was arrested in Binghamton, New York for disorderly conduct and possession of marijuana.

24. The New York records further revealed that on November 8, 1979, only five weeks *after* Helena Payton was attacked in Raleigh, Blackmon was again arrested in Binghamton, New York for trespassing.

25. There was no evidence that Mr. Blackmon had traveled to Raleigh between his arrest in Binghamton on August 24, 1979 and his arrest in Binghamton on November 8, 1979.

26. The earliest evidence RPD had of Blackmon's presence anywhere in North Carolina (other than when he was a small child) was an arrest in Lumberton for misdemeanor larceny for stealing cookies from a grocery store in December, 1980, more than a year after Helena Payton was attacked.

6

27.     Although Holder and Munday could not establish that Blackmon was even in North Carolina, let alone Raleigh, on the day Helena Payton was attacked (or even within a year of her attack), and his fingerprints did not match the prints found at the crime scene, defendants Holder and Munday continued to focus their investigation on Blackmon.

28.     On September 26, 1983, Holder and Munday met with Jackie Kelly at Fort Benning, Georgia, where Ms. Kelly was serving in the Army.  Ms. Kelly, who saw the killer face-to-face from just a few feet away and was confident she could identify him if she saw him again, was shown a photo array that included a photo of James Blackmon.  She did not identify him, or anyone else, as the person who had attacked Helene Payton.

29.     On October 31, 1983, Ms. Kelly went to Central Prison in Raleigh with Holder and Munday to view a live lineup that included James Blackmon.  Ms. Kelly testified under oath about this lineup during the Innocence Commission hearing and before the panel of three Superior Court judges that she did not identify Blackmon. Afterward the detectives informed her that Blackmon "had confessed."  Despite this, she told Holder and Munday that  if Blackmon had "confessed" he must be mentally ill because he was not the person she saw face-to-face the morning Helena Payton was killed.

30.     The only "evidence" connecting Blackmon to the crime was his so-called "confession."

The Alleged Confession

31.     Holder and Munday conducted no fewer than 13 interviews and interrogations of James Blackmon, prior to which they intentionally and deliberately calculated how to exploit Blackmon's severe mental illness, delusional disorder,

intellectual disability, and susceptibility to suggestion to extract statements that could be used to implicate him for this unsolved murder.

32.    Blackmon's interviews with Holder and Munday are filled with expressions of delusional thinking and numerous statements that were inconsistent with the known and objective evidence in the case.

33.    Dr. Edward Landis is an expert forensic psychologist retained by the NCIIC staff to review and opine about aspects of Blackmon's mental health history, including the veracity of his alleged "confession." He was engaged as a neutral expert by a neutral independent State agency investigating Blackmon's claim of innocence.

34.    Dr. Landis testified, in part, as follows:

> It appeared that Mr. Blackmon was motivated to keep spending time with the detectives and talking with them partly because he was still in some distress, and the police treated him deferentially. They talked with him like a peer, they were certainly nice to him, gave him coffee, cigarettes, drove him places a couple of times at his request. So he was motivated to continue doing that.
>
>                    *              *              *
>
> You know, I think if I sat with Mr. Blackmon, I could probably get him to tell me he can play the piano and tap dance.

NCIIC Hearing, Tr. Vol II at 310-12, 337.

35.    Renee Minella is a forensic supervisor for the CCBI. In November, 2018, at the request of the NCIIC staff, Ms. Minella compared the latent fingerprints lifted from the bathroom stall door at Latham Hall on the day Helena Payton was attacked, to the known fingerprints of James Blackmon. She determined that Blackmon was excluded as the source of the fingerprints from the bathroom stall. Her finding that Blackmon's prints

8

did not match the crime scene prints is consistent with the CCBI fingerprint analysis report from February, 1983.

36.     Ms. Minella also ran the crime scene prints through the Automated Fingerprint Identification System (AFIS).  When she did so, she found a "hit" for James Leach.  She compared James Leach's fingerprints to those lifted from the crime scene and determined that Leach's left thumbprint matched a thumbprint lifted from the bathroom stall door where Helena Payton was attacked on September 29, 1979.  In other words, James Leach was the source of that fingerprint.

37.     James Leach died October 11, 2008.  He amassed a lengthy criminal record during his lifetime, all of which occurred in Raleigh.   Most of his crimes were committed after Holder and Munday had focused exclusively on Blackmon, and therefore failed to run the latent print from the crime scene through any data base.   If they had done so, Leach would have been identified as the perpetrator, and many additional violent crimes could have been prevented.

38.     NCIIC staff interviewed several witnesses who knew or were related to Leach.  Janice Bass, a former girlfriend of Leach, stated that Leach carried a knife "all of the time."  She described the knife as having a brown handle and a silver blade about 4" long that folded down.  John Leach, Leach's brother, stated that Leach carried a knife all his life.  He described it as a brown folding knife with a blade about 6" long.  These descriptions of Leach's knife were consistent with the knife recovered from the scene of the murder.

39.     NCIIC staff interviewed numerous witnesses to try to determine whether Leach could have had any legitimate reason to have placed his hand on the 6th floor bathroom stall door of a women's dormitory on the campus of St. Aug's.  None was found.

40.     During the NCIIC hearing, Jackie Kelly testified that a photo of Leach "looked like" the man she saw fleeing the crime scene on the morning of the attack.  NCIIC Hearing, Tr. Vol. II at 239.

41.     James Blackmon's wrongful conviction was the result of deliberate and intentional misconduct by defendants Holder and Munday and the failure of the City of Raleigh to adequately train and supervise the detectives in the RPD Major Crimes Task force.  That misconduct not only caused the erroneous conviction of an innocent man, resulting in his incarceration for more than 35 years for a crime he did not commit, but it allowed the real killer – James Leach – to elude apprehension and continue to commit crimes in Raleigh, including many crimes of violence, for years to come.

42.     James Blackmon brings this action against defendants seeking monetary damages pursuant to 42 U.S.C. § 1983 and North Carolina law for depriving him of his liberty without due process of law, in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States and the laws and Constitution of the State of North Carolina.

## **PARTIES**

43.     Plaintiff James Blackmon is an individual who resides in North Carolina. Although the Guardian of his Estate, Paul Truett Canady, II, recently discovered a birth certificate indicating his legal name may be Jimmy Andrew Underwood, Blackmon cannot confirm that this is his birth certificate, and he has been known by the name "James

Blackmon" with relatives and others for as long as he can remember. He was arrested, convicted and imprisoned for more than 35 years under the name James Blackmon, so that name is used throughout this Complaint.

44. Paul Truett Canady, III, is an attorney who practices law in Robeson County, North Carolina. He was appointed to be James Blackmon's Guardian of the Estate by the Robeson County Superior Court on November 25, 2019.

45. On information and belief, at all times relevant to this Complaint defendant James Holder was a resident of Wake County, North Carolina. He was employed as a detective with the Raleigh Police Department and was assigned to investigate the September 29, 1979, murder of Helena Payton. At all relevant times he was acting within the scope of his official duties and under color of law. Defendant Holder is sued in his individual capacity, and is a "person" as that term is used in the text of 42 U.S.C. § 1983.

46. On information and belief, at all times relevant to this Complaint defendant Andrew Munday was a resident of Wake County, North Carolina. He was employed as a detective with the Raleigh Police Department and was assigned to investigate the September 29, 1979, murder of Helena Payton. At all relevant times he was acting within the scope of his official duties and under color of law. Defendant Munday is sued in his individual capacity, and is a "person" as that term is used in the text of 42 U.S.C. § 1983.

47. Defendant City of Raleigh is a municipal corporation organized under the laws of the State of North Carolina. The Raleigh Police Department is, and was at all times relevant to this Complaint, a department of the defendant City of Raleigh.

11

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

49.     This Court has jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a).

50.     Venue in the Eastern District of North Carolina is proper pursuant to 28 U.S.C. § 1391.

## JURY DEMAND

51.     Pursuant to the Seventh Amendment to the Constitution of the United States, Plaintiff hereby requests a jury trial on all issues and claims set forth in this Complaint.

## FACTS

### The Murder of Helena Payton

52.     On September 29, 1979, Helena Payton lived on the campus of St. Augustine College ("St. Aug's") in Raleigh, North Carolina. She lived in Room 608 on the 6th Floor of Latham Hall with her roommate, Elvin Euvonne ("Bonnie") Turner.

53.     Ms. Payton arose that morning between 6 a.m. and 6:15 a.m. to go to the bathroom. She had only been outside the room for about one minute when Ms. Turner heard her screaming. Ms. Turner opened the door to their room and could see into the bathroom, which was directly across the hall from their dorm room. She saw Ms. Payton trying to run toward her. Ms. Payton was bleeding from the neck. As she was running toward Ms. Turner, Ms. Payton said "Bonnie, he stabbed me."

54.     Ms. Payton had received a single severe stab wound to the base of her neck.

12

55.     Ms. Turner looked to her left down the hall and saw a black man standing in the hallway.  He went out the stairway exit door to her left, which is the east side of Latham Hall.

56.     Ms. Turner described the man she saw to RPD officers investigating the crime that morning.  She said he appeared to be about 6'1" tall, maybe taller.  He had short "natural" hair.  If he had any facial hair "it was very little."  He was wearing dark pants and a dashiki.  Ms. Turner said she would know the person if she were ever to see him again.

57.     Ms. Payton's screams that morning awakened several other students living on the 6th floor of Latham Hall.

58.     Joan Avent lived in Room 605.  She heard screaming that morning and looked at her clock.  The time was 6:11 a.m.

59.     Jackie Kelly lived in Room 602.  Room 602 is located on the southwest corner of the 6th floor.

60.     When Ms. Kelly heard screaming she got out of her bed, opened the door to her room, and stepped into the hallway.  She saw a black male come out of the bathroom and walk directly toward her down the hallway on the west side of the building.  She reported to RPD investigators that he "passed within a few feet" of her in the hallway, turned left and walked toward the elevator.  The elevator is located on the east side of Latham Hall directly across from the stairwell on that side of the building.

61.     Ms. Kelly described the man she saw that morning as about 6'3" tall, maybe taller.  He was wearing a maroon dashiki, dark trousers, and sneakers.  He had a medium

13

to short afro and "a fairly clean face."  She did not notice any hair on his face, but if he did have facial hair "it was very, very light."

62.     The RPD report of Ms. Kelly's statement notes that she saw the "subject at a very close distance" and "got a very good chance to observe the suspect.  She feels she will definitely know this subject if she were to see him again."

63.     Anette Goldring lived in Room 605.  She opened the door of her room when she heard Ms. Payton screaming and saw Ms. Payton in the hall.  She then saw the exit door on the east side of the building open and just caught a glimpse of a black man leaving the 6th floor via that stairwell.  She said he had an afro about 1" long, but that was all she was able to describe.

64.     Barbara Lee lived in Room 602.  When she heard screaming she went into the hallway "right away."  She looked toward the elevator and saw a man going down the stairway.

65.     Sarah Collins and Alfreda Hussey lived in Room 616.  They heard the screams but did not leave their room.

66.     Carolyn Wilson lived in Room 603.  When she heard Ms. Payton's screams she was frightened and did not leave her room.  However, she looked out her window and saw a black man in a maroon dashiki going toward the parking lot to the west of Latham Hall.  She only saw the man from the back.

67.     William Judkins was employed as a security officer at St. Aug's.  He heard women yelling from the 6th floor of Latham Hall and headed for the front of the building.  He saw a black man come out the front door wearing a maroon top and dark trousers.  Judkins told the man he wanted to speak with him and the man began to run to his left.

He saw the man go around the northeast corner of the building before he lost him. He described the man as around 6'0" tall and about 165 pounds. He believed he could identify the man if he saw him again.

68.     Vivian Best lived in Room 601 in Latham Hall. She looked out her window about 7 a.m. or 7:30 a.m. and saw a black male come out of the woods from behind Cheshire Hall. Cheshire Hall is adjacent to the south of Latham Hall. She described the man as about 6'2" and slim.

69.     Viola Underdue was a St. Aug's student who lived on the fourth floor of Latham Hall. She was at a bus stop on Oakwood and Tarboro streets at about 7:05 a.m. on the morning of September 29, 1979, when she saw a black male about 6'3" to 6'5" with an athletic build walking west on Oakwood Avenue.

70.     Later that day Ms. Turner and Ms. Kelly went to CCBI, looked through mug books, and assisted in making a composite drawing of the suspect.

71.     A St. Aug's security officer found a maroon dashiki in the woods west of Cheshire Dorm. Later forensic testing of the dashiki revealed the presence of human blood.

72.     RPD recovered a folding pocket knife under a table in the first floor lounge near the front door of Latham Hall. The knife was 5" long closed, with a wooden handle and a blade 4 7/16" long and 9/16" wide at its widest point. Later forensic testing of the knife revealed the presence of human blood. The FBI conducted fingerprint testing on the knife. No latent prints could be developed.

73.     RPD Identification Specialist James Hardy was at the crime scene that morning. He photographed the knife and processed the scene. Hardy was able to

develop latent fingerprints from the door of the bathroom stall where Ms. Payton was attacked.

74.     Ms. Payton was taken to Wake Medical Center for treatment of her wound. RPD investigator S.B. Price went to the hospital to speak with her but was told she was in the Intensive Care Unit and he could not talk to her.  He met Ms. Payton's mother at the hospital who told him that she had been able to speak with her daughter briefly when she was brought to the Emergency Room.  Her daughter told her she did not know the man who attacked her.

75.     On October 30, 1979 Helena Payton died from her wound.

**Numerous Suspects Are Eliminated By
Photo Arrays, Lineups, and/or Fingerprint Exclusions**

76.     In the days and months after the attack in Latham Hall officers of the RPD continued to investigate the murder of Ms. Payton, without success.

77.     On at least six occasions in the weeks following Ms. Payton's attack, RPD showed photo arrays containing possible suspects to several of the women who were eyewitnesses.  Viola Underdue, Barbara Lee, Jackie Kelly, Vivian Best, Carolyn Wilson, and Elvin Turner were all shown photo arrays, some of them on multiple occasions.  The suspects in these photo arrays were all eliminated when the witnesses were unable to make a positive identification.

78.     Between October 15, 1979 and April 24, 1981, RPD conducted at least four live lineups that included possible suspects, also without success. Ms. Kelly, Ms. Wilson, Ms. Turner, Ms. Lee, Ms. Underdue, and Ms. Turner participated in these lineups.  The men in these lineups were eliminated as suspects when the witnesses were unable to make a positive identification.

16

79.     The CCBI performed numerous fingerprint comparisons between various possible suspects and the latent prints lifted from the crime scene. When a suspect was excluded as the source of the fingerprints found at the crime scene, that person was eliminated as the perpetrator.

80.     The CCBI maintained the fingerprint card with the latent prints developed from the crime scene in a manilla envelope. There is handwriting on the outside of the envelope. The writing at the top of the envelope reads "No Ident." Beneath that, also in handwriting, are several names. The names under the heading "no ident" are: James Otis Wright, Charles L. Feith, Victor C. Mangum, William Poole, Jonathan Robinson, Tommy A. Garrett, Eddie Lee Barnes, Andrew Dennis Wms[2], Ronald G. Wilkins, Michael R. Alston, Lamar Davis, Randy C. McLamb, Willie KR. Frazier, Johnny Avery – alias V. A. Abdullah, Morris Moore, Jackie J. Evans, Derry F. Washington, Cleveland S. Harris, and David Lee Williams. These are names of individuals whose known fingerprints were compared to the latent prints developed from the crime scene. These 19 individuals were eliminated as suspects when they were excluded as the source of the crime scene prints.

81.     All tolled, approximately 40 individuals were eliminated as suspects after it was determined that they were not the source of the latent print found at the crime scene.

82.     RPD also received numerous tips, some of which were anonymous, in which the tipsters identified individuals they believed to have been the perpetrator of the attack on Helena Payton. None of those tips resulted in an arrest.

83.     Although RPD eliminated dozens of suspects prior to February 1981 when they were excluded as the source of the crime scene prints, or when eyewitnesses failed

_____
[2] Beside this name is a dash followed by "elim."

to identify them in live lineups, or when eyewitnesses failed to identify them from photo arrays, these same factors did not dissuade Holder and Munday from their single-minded focus on James Blackmon after they took over the investigation.

**Holder and Munday Take Over as Lead Investigators**

84.     By early February 1981, the case remained unsolved.

85.     On February 3, 1981 RPD's Major Crimes Task Force met to discuss the case.  Holder and Munday were members of the Task Force.  At some point during or following that meeting, but no later than January 18, 1982, Holder and Munday took over as the lead investigators into Ms. Payton's unsolved murder.

86.     By or before mid-January 1982, RPD engaged a psychic by the name of Mr. Dykshoorn to identify the person who murdered Helena Payton.

87.     On January 18, 1982, Holder participated in a crime scene tour with the psychic Mr. Dykshoorn.

88.     The psychic allegedly "divined" an image of the attacker from which a composite drawing was produced.  He also "divined" a description of a car he believed the offender to have driven, though all the eyewitnesses only saw the suspect on foot and no one mentioned a car.  The psychic also "divined" that after the suspect left the crime scene following the attack on Ms. Payton, he went to the Sun Market on Oakwood Avenue, though at the time of the offense the Sun Market did not exist.  The location was a gas station.

89.     Despite these obvious inconsistencies, Holder and Munday followed up on what RPD characterized as "The Dykshoorn Theory."

18

90.     The owner of the gas station was interviewed by RPD.  He said he opened the station at 7:30 a.m. every day, that he remembered the stabbing at St. Aug's, and he was sure no one came to his station that morning who did not belong there.

91.      On July 26, 1982 Holder and Munday showed Dykshoorn's composite drawing to Dr. Wiley Davis, the Dean of Students at St. Aug's, and Chief Adams, the Chief of St. Aug's security.  Holder and Munday learned from these gentlemen that a St. Aug's student looked like the composite made from the psychic's description and that he drove a car similar to the psychic's description of the suspect's car.  Holder and Munday investigated the student, including having his fingerprints compared to the prints lifted from the crime scene.  The man identified based on what the psychic had "devined" was eliminated as a suspect when his fingerprints did not match the crime scene prints.

92.     The "Dykshoorn Theory" did not result in an arrest.

93.     Holder and Munday also pursued a theory that a number of the women students residing on the 6th floor of Latham Hall were working as prostitutes and that the attacker had been ripped off and was waiting in the bathroom to exact retribution against the woman who cheated him.  There was no evidence to support this theory.

94.     Holder and Munday interviewed several of the women who lived on the 6th floor of Latham Hall on the day Helena Payton was attacked, including Jackie Kelly, Elvin Turner, Barbara Lee, Sarah Collins, and Alfreda Hussey.

95.     The women recounted their recollections of that morning, including their descriptions of the assailant and the route they saw him take to leave the floor, which were in all material respects identical to what they told RPD investigators on the day of the offense.

## The Uncorroborated Dix Information

96.     N.S. Lockey was a detective in the RPD's Vice and Narcotics Division.[3]

97.     On February 8, 1983, Lockey "received information that a black male subject who was a patient at Dorothea Dix Hospital was talking about committing murders."  According to Lockey's unidentified source, the patient at Dix had allegedly:

> mentioned a murder of a black female at St. Augustine College and had mentioned a murder of a black female in Durham, North Carolina.  The suspect talked about murdering other black females in Wake County (at least three) and at least two (2) murders in New York and New Jersey. (All black females) The suspect was described as a black male with a close cropped afro and a close cropped mustache and beard.  He was described as tall and muscular and that the suspect was very personable and the type that would not hesitate to talk to you if you met him on the street.  The suspect was supposed to have been very graphic in his description of how he killed these women.  He was supposed to have been very violet (sic) and brutal and liked to cut women and supposedly to have make (sic) a statement about how he liked to feel the knife go in. He also made statements as to how much he loved his knife.

98.     Lockey also reported that he contacted the source of this information on several occasions seeking the name and "exact location" of the person.  The source "was extremely hesitate (sic) because of personal fear and mistrust of the police."  The source refused to meet with Lockey and would not "discuss the case with [him] face-to-face or anyone else."

99.     Lockey did not identify his source.  He did not report whether the person was male or female, had ever provided reliable information in the past, or was a mentally ill patient receiving treatment at Dix.  He did not elaborate on the reason the individual mistrusted police.

---

[3] Detective Lockey passed away some unknown number of years ago.

100.    On February 23, 1983, Lockey reported that his source told him that the person was a "voluntarily committed patient" at Dix and was in 302 McBride Building.  He was not sure of the individual's last name but thought it was "Braemar or Brammer or Bramer, or something like these names, starting with the letter 'B'."

101.    After receiving this information Lockey contacted "a second source" at Dix and asked for a "rundown on black males in 302 McBride Building who were admitted in the last several months from Wake County."  This "second source" reported that the only subject who fit the criteria was James Blackmon.

102.    The "second source" advised Lockey that Blackmon served time in Central Prison in Raleigh and at Attica in New York.

103.    Lockey called the Records Section at Central Prison and learned that Blackmon had been convicted of larceny in Robeson County for stealing cookies from a grocery store and was an inmate at McCain Correctional Institution and Central Prison on that charge from December 30, 1980, until June 23, 1981.

104.    Lockey went to the Records Section at Central Prison and reviewed Blackmon's prison record.  Among the records was Blackmon's medical file.  Lockey reported that file revealed the following information:

2/3/81 – Subject was suicidal and homicidal and was in a crisis situation on this date and was placed in isolation.  The doctor made a note, "He seems to be begging for help."

6/23/81 – Medical exam:  Diagnosis as paranoid schizophrenia in active phase.  Antisocial.  Delusional.  To be sent to State Psychiatric Hospital. On Thorazine 200 milligrams, twice a day and 300 milligrams, Thorazine at Bedtime.

6/23/81 – Takes [i]nordinate amount of staff time to prevent him from harming others.  Hostile.  Grandiose.  Paranoid.  Subject believes he has special knowledge and powers.

21

105.    Lockey also reported that the Central Prison medical record stated that Blackmon "is a borderline mental deficient.  He has a (sic) IQ of 74 and a 4th grade education."

106.    Lockey obtained copies of Blackmon's fingerprints and submitted them to the Raleigh/Wake County City-County Bureau of Identification ("CCBI") to compare with the latent fingerprints developed from the scene on the day of Helena Payton's murder.

107.    On February 25, 1983, RPD received a report from CCBI that Blackmon was excluded as the source of the fingerprints lifted from the Helena Payton crime scene.

**Blackmon's Location at the Time of the Payton Murder**

108.    On March 8, 1983, Lockey contacted the Binghamton, New York Police Department and requested copies of all the files they had regarding Blackmon.

109.    On March 11, 1983 Lockey reported that he received a file from the Binghamton Police Department that included Blackmon's Binghamton Police Department records, Attica Prison records, Elmira Prison records, Glenham Correctional Facility records, and his parole records.

110.    Among the Binghamton, New York records was a report revealing that on August 24, 1979, *one month before* Helena Payton was attacked in Raleigh, Blackmon was arrested in Binghamton for disorderly conduct and possession of marijuana.

111.    New York arrest records available to RPD[4] established that on November 8, 1979, just *five weeks after* Ms. Payton was attacked in Raleigh, Blackmon was arrested in Binghamton for trespassing.

_____
[4] This information was confirmed by the NCIIC.  It is not clear if Lockey was aware of this in 1983 or not, although the information was certainly available to him, and to Holder and Munday, at the time and thereafter.

22

112.   There was no evidence that Blackmon had travelled to North Carolina at any time between August 24 and November 8, 1979.

113.   Lockey passed the information he received, including the tips from his sources at Dix and the records received from New York, to Holder and Munday.

**The Investigation of James Blackmon by Holder & Munday**

<u>Holder and Munday Fail to Identify the Dix Sources</u>

114.   Holder and Munday never learned the identity of Lockey's sources at Dix. They never learned whether either of the sources had ever provided reliable information in the past, why the first source mistrusted the police, or whether he or she was a mentally ill patient hospitalized at Dix.   They never asked.

<u>Holder and Munday Knew Blackmon Was Intellectually Disabled</u>

115.   The records obtained from New York, which were provided to Holder and Munday, revealed decades of documentation of Blackmon's severe intellectual disability.

116.   A March 16, 1971, record from the Elmira Correctional Institution stated that Blackmon "is a very dull individual of below average intelligence."

117.   An addendum to the March 16, 1971, record dated May 23, 1972, stated: "The most recent psychiatric information we have available is dated 3/31/71, that giving a diagnosis of "organic brain syndrome associated with functional mental deficiency – user of various drugs."

118.   A July 31, 1974, letter from the Chief of the Psychiatric Unit at Attica Correctional Facility stated that Mr. Blackmon has "very poor judgement (sic)," "cannot take any pressure whatsoever," and "[a]lthough his IQ is 77, he gives this examiner the impression that it is less."   And "[o]ne would certainly have to call this individual an

inadequate personality with some mental retardation and whether or not there is a schizophrenia present here is very difficult to assess at this time, without more study. Certainly there is a lot of paranoia here."

119.    An August 26, 1974, parole summary from Glenham, New York Correction Facility stated that "Blackmon is a mental defective and was sent to Rome State School in 1964 and was released in January of 1969."

<u>Blackmon's Physical Appearance Did Not Match the Perpetrator</u>

120.    The New York records created around the date Helena Payton was attacked consistently documented Blackmon's physical appearance to be inconsistent with the eyewitnesses' descriptions of the person who attacked Ms. Payton.

121.    A Binghamton, New York record from Blackmon's arrest for possession of stolen property on February 1, 1978, described him as 71" tall and 165 pounds.  Beside the words "Beard/Goatee and mustache" the word "yes' was check marked.

122.    A Binghamton arrest record from May 10, 1978, for menacing and robbery described him as 71" and 160 pounds.  Beside the words "Beard/Goatee and mustache" the word "yes" was check marked.

123.    A Binghamton arrest record from August 24, 1979, for disorderly conduct and possession of marijuana described him as 71" tall and 165 pounds.  The report stated that he has a "beard" and beside the word "mustache" the word "yes" was check marked.

<u>Holder and Munday Focus on Blackmon</u>

124.    On April 16, 1983, while he was a patient at Dix, Blackmon alleged that he had been assaulted by two Dix staff members and that during the altercation one of the staff members pulled a knife on him.

125.    Special Agent David Keller of the State Bureau of Investigation investigated the incident and and prepared a report.[5]

126.    Agent Keller's report made note of Mr. Blackmon's "long history of mental illness resulting in numerous involuntary commitments to State Psychiatric Hospitals, plus incarceration in Correctional Facilities in Florida, New York and North Carolina." He also reported that Blackmon came to Dix after serving a nine-month prison sentence for misdemeanor larceny.

Holder and Munday Interview SBI Agent Keller

127.    By July 21, 1983, Holder and Munday had focused their investigation on Blackmon as a result of the anonymous tips received from Lockey's sources. On that day, Holder interviewed SBI Agent Keller.[6]

128.    Agent Keller informed Holder that before Blackmon's most recent commitment to Dix he had been living in Raleigh with his girlfriend, Erma Williams. Keller told Holder that Blackmon was committed to Dix after exposing himself to a librarian in the library's bathroom. Agent Keller told Holder that Blackmon admitted to smearing his body with feces and that his mother used to lock him in a closet and feed him bodily wastes.

129.    Although Holder's report of his interview with Agent Keller states that Blackmon "was out on the street in September 1979" (meaning he was not "in custody"

_____

[5] Both staff members were fired from their jobs at Dix, though they were acquitted of criminal charges after a trial.

[6] The report of the interview is signed by Holder. It is not clear whether Munday was also present, though it was their practice to conduct interviews together.

at that time), Agent Keller did not indicate where Mr. Blackmon was living in September 1979.

### Holder and Munday Interview Librarian Barbara Richburg

130.    On August 24, 1983, Holder and Munday interviewed Barbara Richburg, the librarian who alleged Blackmon had exposed himself to her.  She recounted the incident and informed Holder and Munday that she knew Blackmon was living with his girlfriend, Erma Williams, on Garner Road in Raleigh when the incident with her occurred.

### Holder and Munday Interview Yvette Peebles

131.    That same day, August 24, 1983, Holder and Munday interviewed Erma Williams's sister, Yvette Peebles.  Ms. Peebles told Holder and Munday that Blackmon first moved in with her sister on Garner Road "about a year and a half or two years ago." This was well after the Payton murder.

### Holder and Munday Interview Erma Williams

132.    On August 29, 1983, Holder and Munday interviewed Erma Williams at Dix. Ms. Williams had been a patient off-and-on at Dix.  Ms. Williams was first introduced to Blackmon by a man who had been a patient at Dix at the same time she was there.  The introduction occurred in the summer of 1981 or 1982. Blackmon was a patient at Dix at the time, but Ms. Williams was not.

133.    Sometime thereafter, Blackmon moved in with Ms. Williams at her apartment on Garner Road.  She said he lived with her for about seven months.

134.    Holder and Munday asked if Ms. Williams had ever seen Blackmon with a dashiki. She had not.

26

135.    Holder and Munday tried to lead Ms. Williams to say that Blackmon could drive, apparently to explain how he could have been in Raleigh on September 29, 1979 after being arrested in Binghamton, New York on August 24, 1979.

Q.    Back during the seven months that you knew Jimmy, did he drive?

A.    No, he can't drive.

Q.    He can't drive?

A.    No.

Q.    What do you mean he can't drive?

A.    I mean he hasn't any license.  He never learned how to drive.

Q.    How did he get around?

A.    Walked, or thumbed.

*               *               *

Q.    You never seen Jimmy drive any time?

A.    Yeah, he drove my car one time out there at the license place, you know, parking lot, but he couldn't drive.

Q.    Have you ever seen him drive on the road?

A.    No.

Q.    Could he drive a car if he wanted to?

A.    I don't think so.

136.    Asked whether Blackmon ever told her anything about going over to St. Augustine College, she replied "Well, he, well no, I can't remember anything about St. Aug."  She was asked again, "you don't remember anything about St. Aug.?"  She said, "no."

137.    Holder and Munday asked Ms. Williams if Blackmon ever carried a knife. She said, "no."

138.    Ms. Williams said that when she met Blackmon he had a beard.

27

Eyewitness Jackie Kelly Does Not Identify Blackmon

139.    On September 26, 1983, Holder and Munday conducted an interview with the sole eyewitness who had seen the male perpetrator face-to-face in the dorm hall, Jackie Kelly.    Accompanied by RPD officer W.M. Parker, a Psychological Stress Evaluation Test Examiner, Holder and Munday travelled to Fort Benning, Georgia to interview Ms. Kelly, who was in the Army and stationed there at the time.

140.    Holder and Munday asked Ms. Kelly to describe the events of the early morning hours of September 29, 1979.  She told them that she was asleep that morning when she was awakened by someone screaming.  She went to the door of her room to see where the screams were coming from and saw a man walking down the hall toward her.  The man was wearing a dashiki.  He was tall, slender and had black hair.  He looked older than a college student.  She said the guy she saw did not look like a bum.  He was not unattractive and he did not look like he needed "somebody to support his habit."  She said that even though four years had passed since that day, she could identify the man if she saw him again.

141.     Holder and Munday then showed Ms. Kelly a photo array containing a photo of James Blackmon.  Ms. Kelly pulled Mr. Blackmon's photo aside, along with the photo of a man named Barry Chavis.  She reportedly said 'these two looked like they *could possibly be* the suspect."  However, she stated that Mr. Blackmon looked heavier than the man she saw at Latham Hall the morning Helena Payton was attacked.

142.    Following the photo array, Officer Parker administered the PSET to Ms. Kelly.  One of the questions Parker asked was, "Did you positively recognize the suspect in photographs that were shown to you this morning."  Ms. Kelly answered, "no."  Parker

determined "based on her lack of reaction to the relevant questions that she believed her answers during the interrogation were truthful."

<u>Holder and Munday Knew Blackmon Suffered From Severe Mental Illnesses</u>

143. On or about September 20, 1983, Holder and Munday obtained Mr. Blackmon's psychiatric records from Dorothea Dix Hospital in Raleigh.

144. The Dix records showed that Mr. Blackmon had been committed to McCain Correctional Insitution for the Lumberton misdemeanor larceny on December 30, 1980. He was transferred from McCain to Central Prison, and released from Central Prison on June 23, 1981, the day his criminal sentence had been served, when he was involuntarily committed to Dix. He was not released from Dix until June 14, 1982.

145. The records Holder and Munday obtained from Dix also revealed the severity of Mr. Blackmon's mental illness, intellectual limitations, and the massive doses of antipsychotic medications he was regularly prescribed. The records included the following:

a. A Central Prison Hospital Discharge Summary, dated May 19, 1981, that indicates a diagnosis of "manic-depressive psychosis" and medication with 150 mg of Thorazine twice daily and 250 mgs at night;

b. A June 23, 1981, discharge summary from the Central Prison Mental Health Clinic that states Mr. Blackmon was referred to the Central Prison Mental Health Clinic from McCain and "was described as actively psychotic with loose associations and delusional thought processes." The record states, "The perception of self was grandiose and the patient related special knowledge and powers. Delusional thinking was exhibited. The initial diagnostic impression was paranoid schizophrenia, active phase.

c. A May 31, 1981, record that contains "tentative diagnoses" of Schizophrenia, Paranoid, Chronic and Antisocial Personality Disorder. His medications include 400 mg of Thorazine in the morning and 500 mg at bedtime. The recommended disposition is involuntary commitment.

29

d.   A February 19, 1982, psychological evaluation that provides diagnoses of "Schizophrenia, Paranoid Type, chronic and antisocial personality with cyclothymic traits."[7]   The report notes that "prior to his admission he smeared his body with feces.  Upon admission to DDH [Dix], he stated that God and Satan were his fathers, that he could cause floods and earthquakes, that he was going to be a great singer and marry Diana Ross . . ."  The evaluation goes on to report that Mr. Blackmon "stated that he felt like he had 'mental problems,' that he felt like blowing up the world, and that he felt like hurting people when he 'sees the devil coming out of them.'  He stated that he sees devils and angels and hears the voice of God directing the destiny."  He also indicated that God spoke to him through the television.  The evaluation also notes he "achieved only the 4th grade by the time he was 16 years old.  He was administered a WAIS-R test of his IQ and achieved a full-scale score of 69."  It concluded that Blackmon "has an undeveloped sense of identity, extremely poor self esteem, and intense unresolved dependency needs."

e.   A nursing note dated January 21, 1983, that indicates Mr. Blackmon "at times seems [to] distort reality."  The note further states that "In the past he has had delusional ideas and still seems overly preoccupied with religious extremist type material and says he is a prophet and can forsee (sic) the future.  He also has stated he can put spells on people."

f.   A January 21, 1983, initial psychiatric assessment that includes a diagnosis of manic depressive psychosis.

g.   A February 23, 1983 nursing progress note that states Blackmon "continues to wear his turban and at times wears his cape.  He continues to be very grandiose and has preoccupation with religious ideation."

h.   A March 15, 1983 psychosocial assessment stating that "the handicaps James suffered from birth through childhood are staggering.  He was born in prison to a schizophrenic mother.  His family was very poor, and he reports being neglected and abused.  He obtained only a 4th grade education.  He's spent most of his adult life in prisons or mental hospitals in North Carolina and other states."  It goes on to state that "When decompensated he displays psychotic symptoms (delusions, hallucinations, paranoid ideation, etc.) . . ."

146.   Mr. Blackmon's family background was described in the Dix records as follows:

Mr. Blackmon had an extremely aversive childhood.  He was raised by his grandmother who was said to be involved in witchcraft.  His mother had been diagnosed as schizophrenic and engaged in 'street preaching.'  The

_____
[7] Cyclothymic disorder is a form of bipolar disorder.

record indicates that when his mother visited she would lock James in a closet and force him to eat excrement. The record also indicates that Mr. Blackmon said he often had to fend for himself, eating snake and rabbit in order to survive.

147. Upon information and belief, after obtaining and reviewing Blackmon's psychiatric records, Holder and Munday decided to exploit his mental illness as part of their interrogation strategy, in order to get him to confess to the murder of Helena Payton.

<u>Holder and Munday Manipulate Blackmon Based Upon His Mental Illness</u>

148. By October 25, 1983, Holder and Munday knew the following facts about James Blackmon:

    a.    His fingerprints did not match those developed at the crime scene;

    b.    He had a beard and mustache in the month before Helena Payton was attacked, as well as in the months and years afterwards, which was inconsistent with the eyewitnesses' description of Helena Payton's assailant;

    c.    Jackie Kelly, the eyewitness who got a clear view of the assailant as he left the bathroom and walked directly in front of her room, did not identify him as the perpetrator;

    d.    He was arrested in upstate New York for disorderly conduct the month *before* Ms. Payton was attacked;

    e.    He was arrested in upstate New York five weeks *after* Ms. Payton was attacked;

    f.    There was no evidence that he had a car, could drive, or had otherwise travelled from upstate New York to Raleigh in the weeks between his two arrests in upstate New York;

    g.    The only evidence he had ever been in North Carolina was an arrest for misdemeanor larceny in December 1980, more than a year after Helena Payton had been killed.

    h.    He had severe mental illness, including confirmed diagnoses of schizophrenia and delusional thinking, and had been hospitalized at Dorothea Dix mental hospital from October 2 through October 18, 1983; and

31

i.   He suffered from significant intellectual disability and had only made it through fourth grade.

149.   By 1983 it was well known to law enforcement that mentally ill people and people with intellectual disabilities (referred to at the time as "mental retardation") were highly suggestible and prone to making unreliable and false statements under police questioning.

150.   Upon Information and belief, Holder and Munday knew, or reasonably should have known this about people with severe mental illness and profound intellectual disabilities.

151.   Despite this, Holder and Munday deliberately and intentionally used Blackmon's mental illness and delusions to fabricate a false confession to the murder of Helena Payton.

152.   In interrogating Blackmon, Holder and Munday used the following techniques, all of which they knew, or reasonably should have known, were likely to lead him to fabricate a false confession:

a.   They explicitly claimed to be his "friend," gave him food and coffee, paid for him to buy a gift for his girlfriend, chauffeured him around Raleigh, and pretended to have his best interests at heart;

b.   They encouraged his delusional thinking by asking him to imagine scenarios "in his mind";

c.   They encouraged his fixation on "spirits" to cause him to believe there were two James Blackmons, a "good James" and a "bad James," and that the "bad James" did things without the "good James" being present;

d.   They exploited his belief in religion by encouraging "the good James" to "get right with God" by telling them the terrible things "the bad James" had done;

e.   They exploited his mental illness and intellectual disability, which they knew or reasonably should have known made him extremely susceptible to

suggestions and leading questions, to feed him information and to get him to make statements that appeared to be incriminating; and

f.   They took him to the campus of St. Aug's before asking him to describe anything about the campus, took him to the dormitory where the attack had occurred before asking him to describe anything about the scene or where the attack occurred, and showed him the clothing the perpetrator had been wearing and the knife the perpetrator had used before asking him to describe clothing or the weapon.

153.   After they began interrogating Blackmon on October 25, 1983, Holder and Munday ignored everything he said that was inconsistent with their theory that Blackmon was guilty of murdering Helena Payton, including statements Blackmon made that directly conflicted with the objective evidence or showed complete ignorance of the attack on Payton.

154.   As of October 25, 1983, Holder and Munday suffered from a classic case of confirmation bias and tunnel vision.  They believed Blackmon had committed the murder, which caused them to ignore substantial evidence of his innocence and to create a fabricated confession.

Blackman's Severe Mental Illness Was Confirmed When Holder and Munday Interrogated Him

155.   The first interrogation for which any report or record exists occurred on October 25, 1983, although it is clear from the transcript of that interrogation that Holder and Munday had talked with Blackmon previously and had, in their words, become "friends."  It appears that Holder led the interrogation, which quickly confirmed the reports of Blackmon's delusions and mental illness.

156.   For example, during the first thirty minutes of the interrogation, Blackmon told Holder and Munday that he used "masonry," which he said was a form of magic, to cause a judge in Lumberton to "fall out of his chair."  He told Holder that just the previous

33

week he had healed a sick woman at Shaw University using "masonry," that he had learned how to do it "from the thoughts," and that he had been doing "masonry" his entire life. Blackman also told them he had used "masonry" to remove "a bad spirit" from his friend Melvin and took it on himself, but it was now out of him as well.

157. Blackmon's delusions were further confirmed later in the interrogation, when he told Holder and Munday:

> "if I draw the moon, cut the moon out of a piece of paper and put a star there and a flying saucer, and then put the 9 planets around that, you will see things at night.
>
> You see things move. You know like when you're watching on TV, right, watching TV, and all the electricity waves and volts, they is coming through to see the whole of the big picture, all over the world. I used the mirror for a focus, right? Penetration, sending things out. And I get it in my mind, and they come on into being."
>
> And concentrating to it at the same time, what I want to come about, you know, and as I look and get deeper into the details, the elements begin to move, you know. A lot of people don't know that. The mirror is the substance of reflection of time and place. And I'm the only one know how they work.

He also told Holder and Munday at one point "I don't care how many flying saucers or UFO's are there, you know, or where the ships may be."

Blackmon Initially Denied Any Knowledge of the Murder

158. Holder and Munday knew from Dorothea Dix records that Blackmon was "preoccupied with religious extremis[m]." Within a minute after the interrogation began, Holder noticed that Blackmon had a bible in his bag and got Blackmon to agree that the bible was "very close to him." Thereafter, Blackmon referred to the bible and to God a number of times.

34

159.    After telling Blackmon "we've all done things in the past that we wish we hadn't done," Holder asked him "have you done any bad things in Raleigh?" Blackmon said the only bad thing he had ever done in Raleigh was to masturbate during phone calls.

160.    Holder then told Blackmon that people who have done "some real bad things" need to "get everything out and get it behind them and get it squared away." Blackmon agreed and Holder said, "I think the Devil causes us to do a lot of things like that, don't you?" Blackmon replied:

> "People talk about white man is the Devil, okay? In the beginning God was black, then the Devil was black, well then the black has to be the devil. You see what I'm saying?
>
> But people don't see it that way. But the devil is nothing but a thought of mind of ignorance someone doing wrong or doing unjust of someone; anybody that is not a function of the basics of understanding, of loving, the world as people like that, but no matter what color or nationality you may be."

161.    After telling Blackmon they needed his help because there had been a "rash of young black females that have died in Raleigh," Holder asked him if he had "read anything or know anything about any of the girls in the area that have been killed?" Blackmon replied "no."

<u>Holder and Munday Exploit Blackmon's Mental Illness and Delusions</u>

162.    After getting these denials, Holder brought up the topic of St. Augustine, and told Blackmon it was a "black college" with "a lot of religious organizations. He then asked Blackmon "what kinds of religious outfits do they have on campus?" Blackmon replied, "I don't know much about it," and then said:

> Now if you go there you'll see the pyramid. . . Three point dimension, you know, and that be within the between, and the confusion of the snake's head

35

of those master and rules over the people head, and they sent out the word that the referend was going to cut them off.

163. After getting this response, Holder immediately said "let's start with St. Augustine. Do you know where St. Augustine College is?" Blackmon replied "no, I never been there before. I go to Shaw."

164. Holder then began to lead Blackmon (despite his previous denial) as follows: "[d]o you think your body has maybe been to St. Augustine College before but your mind has been some other." When Blackmon replied "Yeah" to this leading question, Holder led him further down this road: "[t]hat's the way you feel? That your body has been there but your mind is somewhere else?" To this leading question, Blackmon replied "Definitely. I'm serious."

165. Holder then began to feed Blackmon information about St. Augustine's. He told Blackmon "they have a lot of beautiful women," they have dorms just for females," and "there's so many different religious groups there." He also suggested that "these religious groups are formed to learn how to control women, I guess."

166. Then Holder began to ask Blackmon a series of questions that assumed Blackmon had actually been at St. Augustine, although Blackmon had already told him he didn't know where it was and had never been there:

Q: Do you think in body you might have been to one of these dorms at St. Aug?

Q. What do you think your body might have done in that dorm?

Q. If your body were to be at St. Augustine College in the dorm where these women are where would you go?

Q: Suppose the girls didn't want you to be there, James?

Q: *When your body, James, went to the dorms*, and your mind was some other place but your body was there, how would you dress?

36

Q.    You never wore a red dashiki?  Never had a red dashiki?

Q:    *Say your body was over in the dorm*, and something happened, what would you do?

Q.    *Put your body on the time that you were over there at St. Aug University in the dorms.*  Can you recall anything else, thinking in your mind now, 1979."  *You were at St. Aug. University*.

Q:    Close your eyes again for me, James.  Just think a minute, *'79, St. Aug University, you talking to a young girl*.  What time is this?

Q:    Where does she stay?

Q;    Do you go back later, looking for her?

Q:    You don't go back looking for that woman?

167.    In short, Holder was asking a severely mentally ill person who had significant delusions to imagine about what he saw and did at a place he had never been.

168.    However, none of those questions resulted in any incriminating statements. Blackmon answered the questions as follows:

a.    When asked what he "thought" his body "might have done in the dorm," Blackmon replied, "Its taught, educate and teach the right way."

b.    When asked "if your body were to be at St. Augustine College in the dorm," "where would your body go," he replied "first it would go into the entrance . . .  sit around, drink a coffee or whatever . . .  from there I would talk to a sister or anyone, have a conversation . . . "

c.    Asked what he would do if "the girls didn't want you to be there," he replied he would "move on.  I would not stay, stick around."

d.    Asked how he would dress "when your body . . . went to the dorms," Blackmon replied "my suit . . .   my pants, my shirt, my vest and my coat and my cape and my children."

e.    When asked if he ever wore or had a red dashiki, Blackmon replied "No.  I had one when I was small, a long time ago."

37

f.      When asked what he would do if something happened while his body was at the dorm, he said," "my first thought would be to call here [the police]. That would be my first motive, but before I do anything, to get you're all's advice."

169.    After the above sequence of questions and answers, Holder and Blackmon talked about going to St. Aug's so Blackmon could "look and see how everything is."

170.    Before going to St. Aug's, Holder continued to ask Blackmon leading questions:

Q.      *You think your body has been over there before*, but your mind hasn't?

Q.      *You think you might would recognize it* if you went back over there now?

Q.      *Does your mind communicate with your body at all,* James, while you were over there, while your body is over there?

Q.      *Would that help clear your mind* as to why your body was over there and what you were doing over there?

Q.      *If we ride over to St. Aug. . .* Just sort of let you see the area, *you can probably tell us where your body went?*

Q.      In the past *when your body was over at St. Aug*, does your mind see any lady getting hurt?

Q.      Has your mind been told of anything like that happening?

Q.      Does your body and your mind, *do you see one of the sisters or some of the sisters getting hurt*?

171.    After Blackmon, suffering from psychotic delusions, says he can "*see* a light skinned girl, real pretty with long hair," Holder asks him "what does your mind see is happening to her."  Holder then says "I want you to *back your mind up **to when your mind tells you about the girl being hurt at St. Aug's**.  How is she hurt?"

172.    In response, Blackmon replies "either he choked her or gave her some kind of drugs to mess up her forever to kill her or some poison.  That's what I see.  I can't see

38

no more." This description of what Blackmon's "mind sees" is inconsistent with the facts of Payton's murder.

Holder and Munday Take Blackmon to St. Augustine College

173.    After these questions did not result in any incriminating statements, Holder and Munday drove Blackmon to St. Augustine's college. Before taking him there, they did not ask him to describe the campus in general, where Latham Hall was located on the campus, or the layout of Latham Hall itself.

174.    Holder and Munday did not tape record anything that was said in the car on the way to St. Aug's, at St. Aug's, or on the way back. Neither took any contemporaneous notes describing anything that they said to Blackmon or that Blackmon said to them.

175.    When they arrived on the campus, Blackmon was allowed to walk around unescorted for about 35 minutes and was at times out of the sight of the officers. During this time, Blackmon talked to several male and female students, but there are no notes about what was said. Blackmon did not do anything incriminating, nor did he say anything incriminating to Holder and Munday.

176.    Blackmon was then introduced by Holder and Munday to Chief Adams, the head of Security at St. Augustine's. There are no notes about what Adams said to Blackmon or what Blackmon said to Adams. Blackmon apparently did not say anything incriminating to Adams.

177.    Holder, Munday and Blackmon then got back into their car to leave St. Aug's. As they were leaving, Munday asked Blackmon if the area they were then driving through "looked familiar." He had not asked Blackmon that leading question anywhere else on campus. In response to this leading, Blackmon said yes.

39

178.    Munday then stopped and backed up the car, and Blackmon got out. Blackmon walked away from the car and into a wooded area onto a path, where he disappeared from Holder and Munday's sight.  When he returned, he allegedly said "there is evil down there, and bad spirits."

179.    Holder claims that as they left the campus and drove by Latham Hall, Blackmon suddenly blurted out "that's the girl's dorm."  "I have been there before."  But there is no description of what Holder and Munday said to Blackmon before this supposedly spontaneous untterance, There's no tape, just Holder's subsequent self-serving report.  There are no notes about what Holder and Munday said to Blackmon after this, or what Blackmon said to them after this.

<u>Holder and Munday Manipulate Blackmon's Delusions To Get Admissions</u>

180.    The next day, October 26, 1983, Blackmon came to the police station in the morning to see Holder and Munday.

181.    After he arrived, Holder and Munday took him to McDonald's to eat. Although they had a conversation with Blackmon, they did not record this.  There is no report and there are no notes about what they said to him or what he said to them.

182.    That day, Blackmon was still saying things that made no sense.  For example, within a few minutes after the start of the interrogation on October 26, Blackmon claimed that his mind could:

> "foresee things that later on in the past and present comes.  You know.  And I can just penetrate to certain things, and I can see certain things, you know, and I know what a matter of problems which is consistent in being there, where guys treating girls bad, girls treating guys bad, there's a whole lot of confusion.  But now they're going to do right."

A little later, he told Holder and Munday that when he could not find the police station:

"I was mad, man. . . . But then something cooled me, the voice of God told me 'take your time, my child, walk one step at a time, and then very patiently, come together with yourself.' I see an angel saying to me, angels sound like white people, but they're black and white together. Beautiful, man, the music was so beautiful, like the song the one of the angels sings now, because, wait a minute, I want to think of it."

**October 26, 1983 - 9:36 A.M. - 10:43 A.M.**

183. Starting at about 9:36 a.m. continuing until about 10:43 a.m., Holder and Munday interrogated Blackmon. Although during that time Blackmon gave them information that was inconsistent with him having been the perpetrator, Holder and Munday ignored that information.

184. For example, the perpetrator did not have a beard or mustache, and had short hair, but Blackmon told Holder that he had had a beard and mustache, and long hair, "ever since I was 18 or 19." Although the attack on Helena Payton occurred at 6:10 in the morning on September 29, 1979, Blackmon told Holder and Munday that he got to her dorm "about noon, almost night." Although the attack occurred in the bathroom on the sixth floor of the dorm, Blackmon told Holder and Munday he heard a girl in the dorm screaming "in her room." Holder and Munday ignored these and other inconsistencies with the facts.

185. During the first hour of this interrogation, Holder and Munday asked Blackmon a series of leading questions designed to get him to say that the "bad James" had been on the top floor of the dorm, the scene of the attack on Helena Payton, on September 29, 1979. After they asked Blackmon "where have you been in that dorm," Blackmon replied, "I'll say about on the top floor, *actually through the whole complete building*." Holder then focused Blackmon on the top floor with leading questions:

Q.    You've been the whole complete building, *and you see your body on the top floor?"*

Q.    What do you see your body doing *on the top floor*?

Q.    What is it like *on the top floor* James?

Q.    Just concentrate now on that dorm that you picked out yesterday, as your body being in there, and *you're on the top floor now*. . . . *How does your body get to the top floor*?

186.    Blackmon tells Holder and Munday that after walking up the stairs to the fourth floor, "I elevate myself to the top; and when I elevate myself to the top, I see some of the most physical ladies in the world." Holder replies, "Very good.  Now let's just take a minute and *with your eyes closed and thinking about your body through your mind. Look up on the top floo*r, James.  **You're on the top floor.**"

187.    After Blackmon takes a five-minute bathroom break, Holder and Munday continue to lead him about what the "bad James" had done on "the top floor."

Q.    Now, *the top floor*. . . . Something happened.  Something you had no control over.

Q.    *Your body was there*.  You were re-formed.

Q.    And *something happened*, James, something you had no control over.

Q.    And you know, *somebody got hurt*.

188.    But when Holder attempts to get Blackmon to describe the top floor of the dorm, Blackmon can provide only a vague generic description.  He says there are "5, 6, or 7, about 4 or 5 rooms, something like that."  He says there is "a lobby" and "a phone." But Blackmon does not mention a bathroom, the key location where the attack on September 29, 1973 actually occurred.  He is not asked to provide any specifics about the layout of the top floor, or to draw a diagram.

189. Instead, Holder suggests they actually go to the top floor of the dorm and Blackmon eagerly agrees, saying "I will know everything." When Holder asks him "You want to do that," Blackmon says, "yes, now." Holder says, "let's do it."

**October 26, 1983 - 10:43 A.M. - 12:32 P.M.**

190. During the next two hours, Holder and Munday take Blackmon to the dorm where Helena Payton was attacked and allow him to wander around, particularly on the top floor. Nothing they say to him or that he says to them is recorded. Upon information and belief, no contemporaneous handwritten notes are created.

191. Instead, at some later point Holder and/or Munday prepared "Investigative Notes" of this trip to Latham Hall. But these notes are inconsistent with the tape-recorded statements of Blackmon. The notes assert that "Blackmon requested earlier that he *wanted to show these investigators where he went in Latham Hall and also show them what he did and where it happened.*" The transcript of the interrogation before the trip to the dorm does not contain any statement by Blackmon that he "wanted to show these investigators where he went in Latham Hall and also show them what he did and where it happened."

192. Importantly, what the Investigative Notes documents is that during the escorted tour of the top floor of Latham Hall, although they walked right by the door to the bathroom, Blackmon did **not** say that he had gone into the bathroom, where the attack on Payton occurred, or that the bathroom looked familiar. **Rather, Holder told Blackmon "to look into the bathroom to see if it looked familiar."** Holder's notes then claim that Blackmon identified the stall where Payton had been attacked, and said he had washed

his hands in the sink afterwards. But no blood had been found in the sink on the day of the attack.

193. Holder's notes also claim that Blackmon showed Holder how he left the sixth floor, but the route he allegedly described was inconsistent with what eyewitness Jackie Kelly told the investigators on September 29, 1973 - that the perpetrator had walked right by the door to her room. The path Blackmon claimed to have taken did not pass Kelly's room. Holder and Munday simply ignored this.

194. Having spent the previous three hours focusing Blackmon's attention on the "top floor" of Latham Hall, and after bringing him to inspect Latham Hall (particularly the "top floor") and the surrounding area, Holder and Munday then resumed their interrogation.

**October 26, 1983 - 12:32 P.M. - 12:58 P.M.**

195. When they resumed the interrogation after returning from Latham Hall, Holder and Munday ask Blackmon how "*the other James Blackmon* went into the dorm," "what floor do you end up on," and "how do you go up to the sixth floor?" Blackmon, mirroring what he just experienced at St. Augustine, answers "from the entrance way downstairs," and "the sixth." When asked "how do you go up to the sixth floor," however, Blackmon responds, "You can either go up by elevator or I usually go up by steps."

196. Rather than following up by asking what he meant by "usually" (since all the women on the sixth floor who saw Payton's assailant reported never having seen the man before September 29, 1979), Holder then t**ells** Blackmon the following:

Q.   *You went up by stairway.* All right. Now once you were up there, *you recognized the sixth floor*, you described the sixth floor to me.

Q.   *You described the lobby*.

Q.  *You described the telephone.*

Q.  Now, you mentioned up there that you had been in this room, and *you pointed to room 615.*

Q.  All right, then *you cut through the bathroom . . .*

Q.  *. . .* and *you said you had "this room looks familiar,"* and you were entering and *pointing to room 608"* [Helena Payton's room].

Q.  Okay, *now, something had happened* in Room 608, and you were talking with somebody.  Something was happening.

Q.  Before this happened, coming through the bathroom, *you were looking at the stalls,* coming through from room 615 to 608.

In response to each of these statements, Blackmon simply replied "Mm-hmm."

197.   But when Holder asked him "what did you do to her, James, anything," Blackmon replied "No, I just had made love to her.  She did not want me to leave."  Holder then told Blackmon "*She was hollering*."  Blackmon replied, "Mm."

198.   After changing tapes, Holder then made a number of other statements to Blackmon, such as:

Q.  Lets pick back up, now think for a minute now, *a lot of things are coming back to you.*

Q.  You were walking with finesse on the top floor?

Q.  This is *after the girl had screamed*, not wanting you to leave.

Q.  And *there were several girls looking at you*.  Watching you. They did not want you to leave.  But you were walking with finesse.

Q.  And when you leave, how do you leave, James. *You walk down the stairway sort of fast, taking long steps*.

199.   When Blackmon says that "the way I had to get out was at the entrance I should come in," Holder corrects him by saying, "Okay, that's the way you went out, but

*you came in the side door . . . a different door*." Blackmon responds "uh-huh." He then tells Blackmon "you *came out the entrance door*," "you said *you went into the woods*." Blackmon says "right."

**October 26, 1983 - 12:58 P.M. - 1:20 P.M.**

200.    At this point in the interrogation, without asking Blackmon to describe what "the other James" was wearing, Holder and Munday showed Blackmon the bloody Dashiki the perpetrator had left in the woods outside the dorm, and tell him they want to "see if this can bring back anything at all." When Blackmon says "That's pretty. I'd like to have something like that," Holder asks "Have you ever seen that before?" Blackmon replies "Never in my life, but I would love to have one."

201.    Holder then tells Blackmon "think for me just a minute, please. . . . did the other James Blackmon, not this James Blackmon, but this other James Blackmon, did he have a Dashiki like this?" After Blackmon replied "Yes," Holder asked him a series of other leading questions about the Dashiki:

Q.    Did he wear the Dashiki like this?

Q.    When *the other James Blackmon* was over at St. Aug . . . *he was wearing this?*

Q.    Did *James Blackmon*, at St. Aug, *he was wearing this*?

Q.    The *James Blackmon* at St. Aug *was wearing this on the sixth floor?*

Q.    Was he *wearing this when he made love* to the woman?

Q.    *In the stall*?

Q.    And it caused a lot of confusion?

Q.     Did the other James Blackmon *wear this Dashiki into the woods where he kneeled down and prayed*?

Q. Think for a minute. Think. Did this *James Blackmon* that was in the woods *wearing that Dashiki* . . . what did he do with the Dashiki?

202. Blackmon replied, "he had some candles. A gold candle, a black candle, and a white candle, and he was chanting prayers to God, like the say . . . ." Holder then asked him again, "What did he do with the Dashiki? Is there something wrong with the Dashiki? Blackmon replied:

> "No. There's nothing wrong with it. It's completely self, it's like in the cloth of Jesus' robe, you know, the upraising or the power comes from within this of the texture of many generations back, you know, observing."

Holder replied," Very good. I understand."

203. At this point, Holder and Munday showed Blackmon the knife used by the perpetrator, although they had not asked him to describe any knife he had ever possessed.

Q. I want you to *close your eyes and think of this other James Blackmon*. *Something happened* on the sixth floor. You said a lot of confusion going on, *a lot of screaming*. . . .

Q. Open your eyes now and just look a moment at this. [the knife]. *The other James Blackmon. Do you recognize this? The other James Blackmon* we're talking about. Not this James Blackmon. The other James Blackmon, *several years ago*.

Q. *Wearing the Dashiki, did he have this*. The other James Blackmon.

Blackmon replied "Mm. He had that." But then Blackmon said, "But I never had a knife like that." Holder then continued:

Q. I'm talking about the other James Blackmon. I'm not talking about this James Blackmon. I'm talking about *the old James Blackmon. Did he have a knife like that?*

Q. Did he *have this knife with him* when he was making love to the girl?

Blackmon replied, "Yes, but he did not do nothing to her." He also claimed to have buried the knife in a hole "somewhere," although the knife used in the murder was found in the dorm that morning.

204. Holder and Munday then showed him the composite sketch done at the time of the crime:

Q. Now, I ask you go close your eyes for me once again. Keep your eyes closed for me now, and think, and concentrate for me. *The other James Blackmon,* the old James Blackmon that was *at St. Aug University and wearing the Dashiki and had the knife . . . he looked much like your brother.*

A. Mm-hmm.

Q. *Sort of re-formed into the James Blackmon now*.

A. Mm-hmm.

Q. A little different.

A. Mm-hmm.

Q. Open your eyes and look at this for me.

A. That look just like me. . . . That is me.

Q. Are you sure that's you?

A. Yeah. That's me.

Q. That's the old James Blackmon?

A.. Yeah. I look just like that.

Q. That's the old James Blackmon?

A. Yeah. That's me. I came back again, but that's me.

Q. Okay. *Is that the old James Blackmon that was at St. Aug University?*

A. Yep, that's him. All the way. Yeah. Uh-huh, the cross too.

Q. Now, the beard, *you didn't have much beard then*

48

A.      No.

Q.       And your *hair was a little shorter*?

A.      Uh-huh.  That's me right there.  That's my old self.

*          *          *

A.      If I shaved, I look just like that.  And my hair cut, just like that.

**Wednesday, October 26 - 1:20 P.M. - 1:37 P.M.**

205.    Holder and Munday then arranged for an Assistant District Attorney to sit in on the last 15 minutes of the interrogation.  Holder continued to ask leading questions:

Q.      I know you're having a little bit of a problem seeing what James Blackmon, several years ago, what he did.  You, *it is coming back to you slowly,* but you got a good mind.  You got a good spirit.

Q.       I want you to concentrate for me now, thinking, and just think before you answer, *in your own mind as you see the other James Blackmon at St. Aug.*

Q.      Okay.  Now, I want you to concentrate and see if there is anything unusual about this lady *that James Blackmon cut*?

Q.      *After the girl had been hurt by James Blackmon*, and James  Blackmon walked away, how long did he stay in the woods?

Q.      Did this thing that happened, happen by James Blackmon, the *bad, vicious James Blackmon*?

Q.      What did James Blackmon *do to this girl as she started screaming*?

Q.      Where on her body did—can the other James Blackmon *remember where he cut the girl?*

Q.      But the other James Blackmon *just doesn't know where he cut her?*

206.    Even with prompting from Holder to remember where the "old James" had "cut the girl," Blackmon could not describe the attack on Ms. Payton consistently with the facts.

207. Holder and Munday then attempt to get Blackmon to confirm that he made the statements to the confidential Dix informant that caused RPD to single him out as a suspect in the first place. Blackmon repeatedly denies having made any such statements. The leading questioning persists, however, until he provides a plainly delusional response which Holder's and Munday's confirmation bias cause them to contort to be incriminating.

Q. Did you discuss with anyone at Dorothea Dix about the *old James Blackmon*

Q. . . . *hurting the girl* at St. Aug?

Q. Did you tell some people about going out and *doing things against your will* over at St. Aug.?

Q. And you were seeing bad things happening?

Q. Okay, and one of the bad things that you saw is what happened to that girl at St. Aug?

Blackmon replied, "Yeah, that's when I was penetrating my thoughts and thinking that everybody hating me, no one was listening to subject, so I was sending out badness in the telegrams all over to the peoples that are similar look alike." Holder responded, "I understand."

Eyewitness Jackie Kelly Excludes Blackmon as the Perpetrator

208. On October 31, 1983, at Holder and Munday's request, eyewitness Jackie Kelly came to Central Prison in Raleigh to view a live lineup that included Blackmon.

209. On the morning of the murder Ms. Kelly, who lived in a room just down the hall from the bathroom where Helena Payton was attacked, had "just stood up there looking at the guy." "He came straight at me, but he didn't have no emotion for me that I was standing there, looking at him. He just walked right by me." When asked how close he had come to her, she responded, "He had to pass me." He went right in front of the

50

door to her room while she stood there watching.  She had described him to police as having "a fairly clean face." "I did not notice any hair on it.  If he had any beard or mustache, it was very, very light."

210.    Arrest records from Binghamton, New York showed that Mr. Blackmon had a beard in August 1979, only a month before Ms. Payton was murdered.  Likewise, arrest records from Binghamton in November 1979, just a little more than a month after Ms. Payton was killed, also show that Blackmon had a beard.  Indeed, arrest records going back years before the date of the murder consistently show Blackmon had a beard.  Dix records also reveal that Blackmon had a beard in October, 1983.   He was also known to wear his hair much longer than the hair on the man described by witnesses leaving the scene of Helena Payton's murder.

211.    In Holder's and Munday's interrogation session with Blackmon on October 26, 1983, five days before the lineup with Ms. Kelly was to occur, they asked him if he "always had that much hair and this much beard"?  Blackmon replied "ever since I was 18 or 19."

212.    Knowing that Blackmon's appearance did not match that of the person Ms. Kelly saw on September 29, 1979, Holder and Munday intentionally sought to change his appearance to conform to Ms. Kelly's description.

213.    On or about October 28, 1983, two days before the scheduled lineup with Ms. Kelly, Holder and Munday took Blackmon to a barber for a shave and a haircut.

214.    Despite their efforts to change his appearance to more closely match the decription he had given in 1979, Ms. Kelly did not pick Blackmon out of the line-up.  After being told by Holder and Munday that Blackmon had confessed, she insisted, "this does

51

not look like the guy that I described. . . . If he's crazy, he'll say he's done it, but this does not look like the person I told you or described."

215.　At the NCIIC hearing, various Commissioners asked her about the lineup.

> MR. GRACE [NCIIC Commissioner]:　I have one follow-up. In your answer to the questions from staff, you indicated that at some point the detective showed you a picture and said, "This is the guy we got a confession from," and you told them that was not the guy; is that correct?
>
> THE WITNESS: Right.
>
> ＊　　　　　＊　　　　　＊
>
> MR. EDWARDS [NCIIC Commissioner]:　Okay.　Now, when the Detective made the comment to you -- and, again, I'm paraphrasing - "We have -- one of the suspects, we've got a confession from him."　You said, "That's not the guy."
>
> THE WITNESS:　Right.
>
> MR. EDWARDS:　Was that before or after you were shown the in-person lineup?
>
> THE WITNESS:　I think it was after because I think I was getting ready to head out the door.
>
> MR. BOSWELL [NCIIC Commissioner]:　Could I have a follow-up question to that? What did the detectives say to you when you said, "That's not the guy?"　Do you remember?
>
> THE WITNESS:　"Well, he confessed."　And that's when I made a comment, like, "If he's crazy, yeah, he can say anything.　If he's homeless and need a place to live, yeah, I'd confess too.

NCIIC Hearing, Tr. Vol. II at 202, 204, 212-13, 224-25.

216.　It was the policy of the RPD's Major Crimes Task Force in 1983 to use mobile recording devices to tape record interviews and lineups in the field.

217.　Despite this, there is no recording or transcript of this lineup procedure in the RPD files.

52

218.    RPD policy at the time stated that an officer "must" submit reports of any actions they take.

219.    There is no report of this lineup procedure in the RPD files.

220.    Upon information and belief, because Ms. Kelly had excluded Blackmon as the perpetrator, despite being told he had allegedly confessed, Holder and Munday intentionally concealed the existence of the lineup in the official RPD file.

221.    A Dix psychiatric assessment by Dr. Rowles dated November 17, 1983, confirms what happened at the lineup. "On October 31, 1983, the patient was allowed to leave with the two detectives from the Raleigh Police Department to participate in a lineup. He was not identified on that occasion and was returned to the hospital." The two detectives mentioned in these Dix records were the defendants Holder and Munday.

222.    Jackie Kelly was the only witness who was ever asked to view Mr. Blackmon's photograph or participate in a lineup that included him. She positively excluded Mr. Blackmon as the person who attacked Helena Payton.

223.    Even after Ms. Kelly affirmatively excluded Mr. Blackmon as the man she saw leaving Latham Hall the morning Helena Payton was murdered — and even after she specifically warned Holder and Munday they should be skeptical of his statements "if he's crazy"— Holder and Munday continued to focus exclusively on Mr. Blackmon.

224.    Having failed twice to get a positive identification from Ms. Kelly, they did not offer any of the other eyewitnesses the opportunity to view Mr. Blackmon in a photo array or a lineup.

225.    Instead, the investigation solely involved more questioning of Mr. Blackmon, employing the same tactics, including questioning him following his arrest and

arraignment. None of these additional sessions produced any more credible information of Mr. Blackmon's guilt.

226. From early February 1983, when Lockey received his first tip from his Dix informant, Holder and Munday focused their investigation exclusively on Mr. Blackmon. No other suspect was investigated or considered.

**Defendants' Wrongful Acts Cause Blackmon To Plead Guilty**

227. At all times after his arrest in December 1983, James Blackmon firmly asserted his innocence, and refused to consider any plea bargain to resolve the charges against him. He remained in custody for more than three years.

228. On December 8, 1986, Blackmon's attorney, Thomas Manning, filed a motion to suppress the statements obtained by Holder and Munday. A supplement to that motion was filed on August 17, 1987. That motion was denied on August 31, 1987.

229. After that motion to suppress had been denied, Manning advised Blackmon that he was going to be convicted of first-degree murder at trial, and would be sentenced to life.

230. By January 1988, Blackmon had been detained awaiting trial for more than four years.

231. Manning advised Blackmon to accept the state's offer to plead guilty to second degree murder, because at that time, he could be eligible for parole after serving a total of 10 years. He also advised Blackmon that he would preserve for appeal the admissibility of the statements obtained by Holder and Munday.

232. Blackmon had already served more than four years in pretrial detention, and decided to follow Manning's advice and plead guilty to second degree murder, provided

54

he would not say that he had killed Helena Payton, and that the appeal of the motion to suppress was preserved.

233.    During his plea colloquy on January 14, 1988, Blackmon would not admit that he "was in fact guilty."  A guilty plea was entered pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970).  The Transcript of Plea form indicates that Mr. Blackmon did not answer the question "are you in fact guilty?"

234.    Mr. Blackmon has at all times before and after January 14, 1988 maintained his innocence.

235.    Defendants knew or reasonably should have known that their actions in creating false and fabricated evidence against James Blackmon, which caused his arrest for first degree murder for a crime he did not commit, would result in his accepting a plea bargain to second degree murder with eligibility for parole after ten years, even if he was innocent of the murder.

**Holder and Munday's Misconduct Allowed the Actual Perpetrator
to Commit Additional Violent Crimes**

236.    In July, 2013, the CCBI informed NCIIC that it had located the latent fingerprint card in the case from its storage facility.  On August 2, 2013, NCIIC staff requested that CCBI run the latent crime scene fingerprints through the Automated Fingerprint Identification System ("AFIS") and SPEX fingerprint databases.

237.    The AFIS system contains fingerprints from local and state sources.  AFIS is a computer-based search system in which fingerprints are entered and catalogued. SPEX is a vendor that maintains a database repository of fingerprints from Wake County.

55

238.   Renee Minella is a forensic supervisor employed by CCBI.  She has over 25 years' experience in the study of fingerprints and approximately 20 years as a latent fingerprint examiner.

239.   In August, 2013, Ms. Minella performed the fingerprint search requested by NCIIC staff.  When Ms. Minella ran the latent crime scene fingerprints through the North Carolina state database she got a "hit" for the fingerprint of James Edward Leach.  She then ran the crime scene fingerprints through the local database system.  It also produced a "hit" for the fingerprints of James Edward Leach.

240.   Ms. Minella performed a fingerprint comparison between the crime scene prints and the fingerprints of James Leach.  She positively identified Leach's left thumb print to the print lifted from the door of the bathroom stall where Helena Payton was attacked.

241.   Ms. Minella's supervisor at CCBI in 2013 was Rebecca Heinrich.  Ms. Heinrich also examined the fingerprints and independently verified that Leach's left thumb matched the crime scene thumb print.

242.   By the time he had been identified as the perperator, James Leach had died.  His date of death was October 11, 2008.  He was 28 years old at the time Helena Payton was murdered.  Leach amassed a prodigious record of crimes during his lifetime, most of them *after* the murder of Helena Payton.  Many involved assaults on females.  Leach's record of arrests, all of which occurred in Raleigh, includes at least the following:

Before murder of Helena Payton:

January 8, 1968 – Burglary and Breaking and Entering

May 12, 1977 – Aggravated assault

Case 5:20-cv-00524-FL   Document 1   Filed 10/05/20   Page 56 of 76

<u>After murder of Helena Payton and Fabricated Confession of James Blackmon</u>

April 26, 1986 – Carrying a concealed Weapon

August 20, 1986 – Assault with a deadly weapon

June 4, 1987 – Assault on a female; Assault on a law
 enforcement officer; Resisting a public officer

October 19, 1988 – DWI

August 4, 1995 – Breaking and entering

February 29, 1996 – Injury to personal property

August 27, 1996 – Assault on a female

October 16, 1996 – Assault on a female

January 19, 1998 – Assault on a female

July 3, 1998 – Escape from detention center

April 27, 1999 – Possession of cocaine

June 3, 2003 – Assault with a deadly weapon with intent to
 inflict serous injury and intent to kill

January 5, 2006 - Breaking and entering

243.   Beginning in 1983, because Holder and Munday had focused on Blackmon, whose prints did not match those left by the perpetrator at the scene, they never attempted to have the latent print compared to the other prints in any data base.

244.   By 1986, the NC SBI had access to AFIS.

245.   Upon information and belief, but for the fabricated confession of Blackmon, at some time around 1986, if not before, the latent print found at the crime scene would have been run through AFIS.  Since Leach had been arrested for felonies prior to that time, his fingerprints would have been in AFIS, and a comparison of the latent print

through AFIS would have resulted in Leach being identified as the perpetrator in or around 1986.

246.    Leach had no legitimate reason to have placed his thumb on the bathroom stall door of the 6th floor bathroom of Latham Hall, an all-women dorm.  He was never an employee or student at St. Augustine.  He was not employed in any capacity on or before September 29, 1979, that would have caused him to be on the campus of St. Augustine.

247.    NCIIC staff interviewed several relatives and acquaintances of Leach. Janice Bass, a former girlfriend, stated that *Leach carried a knife all the time*.  The knife had a brown handle and silver blade that folded down.  The blade was about 4" long. Cynthia Leach, Leach's former wife, stated that *Leach carried a knife* and once threatened her with a knife.  John Leach, Leach's brother, stated that *Leach carried a knife* all his life. He described Leach's knife as a brown folding knife with a blade about 6" long.

248.    On November 15, 2018, Jackie Kelly testified before the Innocence Commission.  She was shown a photograph of Leach and asked whether he looked like the man she saw leaving the 6th floor of Latham Hall the morning Helena Payton was murdered.  She answered "yes."

249.    Because Holder and Munday focused exclusively on Mr. Blackmon, the investigation into who truly murdered Helena Payton ended in February, 1983, and left James Leach free to continue a life of crime in Raleigh for the next quarter century.

250.    During that time, he assaulted at least four women, committed *at least* two assaults with a deadly weapon, and committed at least two assaults on law enforcement officers.  And those are only the crimes for which he was arrested.  It is not known how many women he attacked, raped or killed for which he was not arrested.

251.    Upon information and belief, but for Holder and Munday's conduct in fabricating a false confession from James Blackmon, James Leach would have been arrested and convicted of the murder of Helena Payton in or around 1986, and he would not have been able to victimize others after that time.

**Damages**

252.    As a direct and foreseeable consequence of being arrested and incarcerated for over 35 years for a crime he did not commit, James Blackmon has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium and loss of liberty in each year from December 7, 1983 to August, 2019, as well as other damages to be determined at the trial of this matter.

## CAUSES OF ACTION

## FEDERAL CLAIMS

### COUNT I
### 42 U.S.C. § 1983

**DEPRIVATION OF LIBERTY AND DENIAL OF FAIR CRIMINAL PROCEEDINGS IN VIOLATION OF DUE PROCESS CLAUSE OF THE 14TH AMENDMENT**

**(Fabrication of False Inculpatory Evidence)**

(Against Holder and Munday in their individual capacities)

253.    James Blackmon incorporates paragraphs 1 - 252 of this complaint as if fully restated herein and further alleges:

254.    Defendants Holder and Munday deprived James Blackmon of his liberty without due process of law and of his right to a fair criminal proceeding by deliberately fabricating evidence that was used to arrest, prosecute, convict and imprison him for more than 35 years.

59

255.    Defendants Holder and Munday deliberately fabricated evidence by feeding Blackmon facts about the attack on Helena Payton, including but not limited to the layout of Latham Hall, the location of the attack, what the perpetrator was wearing, and the weapon used by the perpetrator, and by exploiting the mental illness of James Blackmon to cause him to make false admissions of his involvement in the murder of Helena Payton using the facts feed to him by Holder and Munday.

256.    Based upon the false and misleading evidence Holder and Munday created in October 1983, James Blackmon was arrested on December 7, 1983 and charged with the murder of Helena Payton.

257.    Blackmon's prosecution thereafter continued based upon that false and misleading evidence, resulted in Blackmon serving more than 35 years in prison for a crime he did not commit, and further resulted in the actual perpetrator, James Leach, remaining free to commit other assaults on women.

258.    Any reasonable law enforcement officer in 1983 would have known – and these defendants did know – that the tactics used to obtain false admissions from James Blackmon were improper, coercive, and highly likely to generate false statements. No reasonable officer would have believed this conduct was lawful.

259.    The misconduct described in this Count was objectively unreasonable and was undertaken willfully, intentionally and/or in reckless disregard for Blackmon's clearly established constitutional rights.

260.    Absent the defendants' misconduct the arrest and prosecution of Blackmon could not and would not have been pursued, and Blackmon would not have been convicted.

261.    The arrest, prosecution, conviction, and confinement of James Blackmon was deliberately and purposefully brought about by defendants Holder and Munday and was the obvious and intended result of their manipulative interrogation of Blackmon.

262.    All of the foregoing acts and omissions were committed under color of state law and violated clearly established law of which any reasonable officer would have known.

263.    All of the foregoing acts and omissions were committed deliberately, intentionally, in bad-faith, and/or with reckless disregard for the rights and safety of James Blackmon.

264.    Defendants' fabrications directly and proximately caused James Blackmon's wrongful arrest, conviction and deprivation of liberty without due process of law during his 35-year imprisonment, as well as the other injuries and damages set forth in this complaint.

## COUNT II
## 42 U.S.C. § 1983

**DEPRIVATION OF LIBERTY AND DENIAL OF SUBSTANTIVE DUE PROCESS IN VIOLATION OF THE 14TH AMENDMENT**

**(Use of Psychologically Manipulative Interrogation Techniques)**

(Against Holder and Munday in their individual capacities)

265.    James Blackmon incorporates paragraphs 1-264 of this Complaint as if fully restated herein and further alleges:

266.    Defendants Holder and Munday, acting in concert, and aiding and abetting one another, deprived Mr. Blackmon of his liberty without due process of law, and of his right to a fair criminal proceeding, by manipulating Blackmon's severe mental illness and

intellectual disability to cause him to fabricate false inculpatory statements despite his actual innocence.

267.    Prior to Holder's and Munday's interrogation of James Blackmon, they knew there was no evidence linking Blackmon to the murder of Helena Payton, and substantial exculpatory evidence indicating he did not murder Helena Payton, including but not limited to the following:

a.    that his fingerprints did not match the fingerprints found at the crime scene;

b.    that his record of arrests from Binghamton, New York showed him to be in New York one month before and five weeks after the murder;

c.    there was no evidence he was present in North Carolina at the time of the crime;

d.    There was no physical evidence that connected him to the crime;

e.    an eyewitness did not identify him as the assailant from a photo array and a live lineup; and

f.    his physical appearance was inconsistent with the eyewitnesses' descriptions of the assailant.

268.    Despite this, Defendant Holder studied Blackmon's mental illness and, based on what he learned from that study, intentionally devised strategies for manipulating Blackmon's mental illness to cause him to falsely incriminate himself.

269.    In October 1983, Holder and Munday caused Blackmon, through the methods more fully described above, to make false admissions by manipulating and otherwise taking advantage of Blackmon's mental illness, intellectual disability and the influence of psychotropic medications.

270.    The techniques used by Holder and Munday to elicit false incriminating statements from Blackmon included, but were not limited to (a) triggering his psychotic

delusional disorder by suggesting there were two James Blackmons (one good and one "bad"); (b) having Blackmon close his eyes and imagine himself in places where he had never actually been and doing things he had never actually done; (c) exploiting Blackmon's psychotic "religious" beliefs by telling him he would get right with God by cooperating with them; (d) pretending to befriend Blackmon by doing him favors and providing him with food and transportation; (e) feeding Blackmon facts that Blackmon could then incorporate into his false admissions; and (f) asking Blackmon extremely leading and suggestive questions.

271. In short, Defendants Holder and Munday intentionally exploited Blackmon's intellectual disability, severe mental illness, and susceptibility to suggestion to cause him to make false incriminating statements. Defendants' conduct was in reckless disregard of Blackmon's constitutional rights.

272. Defendants knew or reasonably should have known that their interrogation of Blackmon using these manipulative techniques would inevitably elicit false incriminating statements despite Blackmon's actual innocence.

273. As a consequence of defendants' intentionally manipulative tactics, they in fact elicited incriminating statements that they knew or reasonably should have known were false.

274. Holder's and Munday's conduct, as described above, shocks the conscience, contravened fundamental principles and canons of decency and fairness, and violated James Blackmon's constitutional right to substantive due process of law, as guaranteed by the Fourteenth Amendment of the United States Constitution.

275. Defendants' conscience-shocking misconduct in October 1983 directly

and proximately caused James Blackmon's wrongful incarceration from December 7, 1983 until August 22, 2019.

276. Defendants Holder and Munday knew, or reasonably should have known, that causing a defendant to falsely confess was likely to produce a false guilty plea, particularly from someone with severe mental illness and intellectual disability.

277. Defendants Holder and Munday knew, or reasonably should have known, that fabricating and causing the fabrication of false evidence violated Mr. Blackmon's constitutional right to due process and a fair criminal proceeding.

278. Defendants Holder and Munday knew, or reasonably should have known that fabricating and causing the fabrication of false evidence was likely to lead to Mr. Blackmon's conviction for the murder of Helena Payton, despite his actual innocence.

279. Any reasonable law enforcement officer would have known — and these defendants did know — that the tactics used in interrogating Blackmon's were improper and highly likely to generate a false confession.

280. No reasonable law enforcement officer would have engaged in the conduct set forth above or believed it to be lawful.

281. After his arrest, Blackmon was held in pretrial detention for more than four years before he finally agreed to enter an *Alford* plea to second-degree murder, while refusing to say he was actually guilty of this crime.

282. The defendants conduct in fabricating and causing to be fabricated a false confession contributed to and proximately caused Mr. Blackmon to plead guilty to the murder of Helena Payton despite his actual innocence.

64

283.    The misconduct described in this Count was objectively unreasonable and was undertaken willfully, intentionally and/or in reckless disregard for Blackmon's clearly established constitutional rights.

284.    Absent the defendants' misconduct the arrest and prosecution of Blackmon could not and would not have been pursued, and Blackmon would not have been convicted.

285.    The arrest, prosecution, conviction, and confinement of James Blackmon was deliberately and purposefully brought about by defendants Holder and Munday and was the obvious and intended result of their manipulative interrogation of Blackmon.

286.    All of the foregoing acts and omissions were committed under color of state law and violated clearly established law of which any reasonable officer would have known.

287.    All of the foregoing acts and omissions were committed deliberately, intentionally, in bad-faith, and/or with reckless disregard for the rights and safety of James Blackmon.

288.    As a direct and proximate result of defendants' deliberate, reckless, deliberately indifferent and/or bad-faith acts and omissions, James Blackmon was deprived of his Fourteenth Amendment rights to a fair criminal proceeding and to not be deprived of his liberty without due process of law, was wrongfully convicted, and suffered more than 35 years of imprisonment.

289.    As a direct and foreseeable consequence of being incarcerated for more than 35 years, James Blackmon has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium and loss of liberty in each year from

1983 to 2019, as well as other damages to be determined at the trial of this matter.

## COUNT III

## 42 U.S.C. § 1983

## MALICIOUS PROSECUTION AND SEIZURE
## IN VIOLATION OF THE 4TH AND 14TH AMENDMENTS

*(Against Holder and Munday in their individual capacities)*

290.     James Blackmon incorporates paragraphs 1-289 of this Complaint as if fully restated herein and further alleges:

291.     Beginning in October 1983, Holder and Munday, acting individually and in concert with each other, under color of state law and within the scope of their employment with the Raleigh Police Department, caused, instituted or participated in the institution of a criminal proceeding against James Blackmon for the murder of Helena Payton on September 29, 1979, and thereafter caused these proceedings to continue until 2019.

292.     The criminal proceeding against James Blackmon was based upon evidence fabricated by defendants Holder and Munday and was therefore not supported by probable cause.

293.     Holder and Munday fabricated this evidence despite their knowledge at all times that, in the absence of the evidence they fabricated, probable cause did not exist to institute, advance or continue James Blackmon's prosecution.

294.     Holder's and Munday's actions were malicious and evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

295.     Holder and Munday created this fabricated evidence in the course and

66

scope of their employment with the Raleigh Police Department and under color of state law.

296.     As a result of the wrongful acts of Holder and Munday, Plaintiff was arrested on December 7, 1983 for the murder of Helena Payton and deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

297.     As a direct and foreseeable consequence of Holder's and Munday's acts and conduct, James Blackmon was unreasonably and unlawfully subjected to criminal prosecution and more than 35 years of incarceration.

298.     The proceedings were finally terminated in Plaintiffs' favor on August 22, 2019, when a three-judge panel unanimously found that James Blackmon was innocent of the charges.

299.     The misconduct of Holder and Munday was objectively unreasonable and was undertaken intentionally, maliciously and/or willfully, or in reckless disregard and indifference to Blackmon's clearly established constitutional rights.

300.     As a direct and foreseeable consequence of being arrested and incarcerated for more than 35 years, James Blackmon has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium and loss of liberty in each year from 1983 until 2019, as well as other damages to be determined at the trial of this matter.

## COUNT IV

## 42 U.S.C. § 1983

## MONELL CLAIM FOR UNCONSTITUTIONAL FAILURE TO TRAIN, SUPERVISE, AND DISCIPLINE

(Municipal Liability Against the City of Raleigh)

301. James Blackmon incorporates paragraphs 1-300 of this Complaint as if fully restated herein and further alleges:

302. Before and during the unlawful prosecution and incarceration of James Blackmon, the City of Raleigh, by and through its final policymaker(s), with deliberate indifference, maintained a policy, custom, pattern and/or practice of failing to adequately train, supervise, and discipline Raleigh Police Department investigators with regard to the proper procedures for interrogating suspects with severe mental illness, intellectual disabilities, or who were under the influence of psychotropic drugs, including but not limited to training, procedures and supervision to:

    a.    Protect against obtaining false confessions due to their susceptibility to suggestion by avoiding leading and/or suggestive questioning;

    b.    Avoid providing any information about the crime scene or the crime;

    c.    Avoid techniques that activate mental illness and cause the suspect to make statements that are unreliable or untrue;

    d.    Ensure there was independent corroboration of the suspect's statements, such as eyewitness testimony or forensic evidence, to assure the suspect's statements were consistent with other evidence and were accurate, reliable, and true; and

    e.    Guard against the risk of false statements due to the suspect's disorganized thought processes and deficits in attention, executive functioning, and intellect.

303.    It would have been plainly obvious to a reasonable policymaker that failing to adequately train, supervise or discipline Raleigh Police Department investigators in connection with fundamental investigative tasks implicating the constitutional rights of suspects, such as how to conduct interrogations of suspects suffering from severe mental illnesses without causing the fabrication of false admissions or statements, would lead to deprivations of suspects' constitutional rights.

304.    The Chief of the Police Department of the City of Raleigh during the relevant time period was a final policymaker for the City of Raleigh with regard to all investigative activities conducted within the City of Raleigh.

305.    The acts and omissions of the Chief of Police during that time constituted the policy, custom, or pattern and practice of the City of Raleigh.

306.    The Chief of Police knew or reasonably should have known that there had been a failure to adequately train, supervise and discipline felony investigators of the Raleigh Police Department, including but not limited to defendants Holder and Munday, with regard to the proper and accepted law enforcement practices and procedures concerning how to conduct interrogations of suspects with severe mental illnesses.

307.    The Chief of Police knew or reasonably should have known that felony investigators of the Raleigh Police Department, including but not limited to defendants Holder and Munday, were disregarding proper and accepted law enforcement practices and procedures with regard to conducting interrogations of suspects with severe mental illnesses.

308.    The Chief of Police failed to adequately supervise defendants Holder and Munday to ensure they were not using interrogation tactics and procedures that would

cause the fabrication of false inculpatory statements from suspects with severe mental illnesses.

309. The Chief of Police agreed to, approved, condoned, and/or ratified the Raleigh Police Department's policy and custom of failing to follow proper and accepted law enforcement practices and procedures with regard to conducting interrogations of suspects with severe mental illnesses and was deliberately indifferent to this policy and custom.

310. The Chief of Police created, promulgated and maintained, with deliberate indifference, a policy or custom, and/or a pattern and practice, which deprived James Blackmon of his constitutional right not to be deprived of his liberty without due process and to a fair trial.

311. No reasonable policymaker would have agreed to, approved, condoned, and/or ratified the Raleigh Police Department's policy and custom of failing to follow proper and accepted law enforcement practices and procedures with regard to conducting interrogations of suspects with severe mental illnesses.

312. Any reasonable policymaker would have known that such a policy or custom would lead to deprivations of the constitutional rights of criminal suspects.

313. The policies and customs agreed to, approved, condoned, and/or ratified by the Chief of Police of Raleigh caused the improper and unconstitutional conduct engaged in by defendants Holder and Munday with regard to the interrogation of James Blackmon in October 1983 and the prosecution of James Blackmon based upon that interrogation.

314.    The acts and omissions that caused James Blackmon's wrongful conviction and incarceration were carried out pursuant to the municipal defendant's policies, customs, patterns or practices.

315.    The municipal policies, customs or patterns and practices of the City of Raleigh proximately and directly caused James Blackmon's wrongful conviction and incarceration.

316.    The failure of the Raleigh Chief of Police to adequately train and supervise the defendants Holder and Munday were a moving force in the denial of Mr. Blackmon's constitutional rights set forth above.

317.    Defendant City of Raleigh is liable for the deprivation of James Blackmon's constitutional rights caused by the policies, practices and customs agreed to, approved, condoned, and/or ratified by the Chief of Police as described above.

318.    As a direct and proximate result of the above described wrongful conduct of defendant City of Raleigh, James Blackmon suffered physical injury, physical sickness, emotional trauma, and loss of liberty in each year from 1983 through 2019, as well as other damages to be determined at the trial of this matter.

## STATE COMMON LAW CLAIMS

## CIVIL OBSTRUCTION OF JUSTICE AND CIVIL CONSPIRACY

## COUNT V

(Against all defendants)

319.    James Blackmon incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

320.   Defendant's governmental immunity has been waived by the City of Raleigh's purchase and maintenance of insurance for defendants' conduct.

321.   Defendants' conduct, as set forth in this Complaint, was reckless and malicious, and public officer immunity therefore does not apply to their conduct.

322.   James Blackmon was determined to be incompetent to manage his own affairs on October 11, 2019, and Paul Truett Canady, III,  was therefore appointed as Blackmon's Guardian of the Estate by the Clerk of Robeson County on  November 25, 2019.

323.   The statute of limitations for all claims James Blackmon had prior to November 25, 2019 was tolled until that date.

324.   Beginning in February 3, 1981, and continuing thereafter until at least 1986, Holder and Munday, acting individually and in concert, engaged in acts and omissions that attempted to and did prevent, obstruct, impede and hinder public and legal justice in the State of North Carolina.

325.   Holder and Munday engaged in this obstruction of justice by intentionally disregarding evidence that pointed to James Blackmon's innocence, and by conspiring to cause the fabrication of false and misleading inculpatory statements by Blackmon with the knowledge that this conduct would advance and perpetuate the criminal process against Blackmon despite his factual innocence.

326.   As a direct and foreseeable consequence of this conduct by Holder and Munday, James Blackmon was unreasonably and unlawfully subjected to prosecution in the Wake County Superior Court for the murder of Helena Payton and confined for more than 35 years against his will.

327. Defendants Holder and Munday committed these acts and omissions in the scope of their employment as Raleigh police officers, and the City of Raleigh is liable for their actions through respondeat superior.

328. As a direct and foreseeable consequence of defendants' conduct, Mr. Blackmon suffered personal physical injury, physical sickness, emotional trauma, loss of consortium, and loss of liberty each year from December, 1983 until 2019, as well as other damages to be determined at trial.

## COUNT VI

## NEGLIGENCE

(Against all defendants)

329. James Blackmon incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

330. Defendant's governmental immunity has been waived by the City of Raleigh's purchase and maintenance of insurance for defendants' conduct.

331. Defendants' conduct, as set forth in this Complaint, was reckless and malicious, and public officer immunity therefore does not apply to their conduct.

332. James Blackmon was determined to be incompetent to manage his own affairs on October 11, 2019, and a Guardian of Estate was therefore appointed by the Clerk of Robeson County on November 25, 2019.

333. The statute of limitations for all claims James Blackmon had prior to November 25, 2019 was tolled until that date.

334. Holder and Munday, acting in the scope of their employment with the City of Raleigh, were at least negligent in their conduct of the investigation of Mr. Blackmon,

their actions causing the fabrication of false inculpatory statements by Mr. Blackmon, and their disregard of the evidence of his innocence.

335. The City of Raleigh is liable for the actions of Holder and Munday through the doctrine of respondeat superior.

336. As a direct and foreseeable consequence of their negligence, Mr. Blackmon suffered personal physical injury, physical sickness, emotional trauma, loss of consortium, and loss of liberty each year from December, 1983 until August 2019, as well as other damages to be determined at trial.

## STATE CONSTITUTIONAL CLAIMS (Alleged in the Alternative)

## COUNTS VII - VIII

## DUE PROCESS VIOLATION UNDER ARTICLE I, SECTIONS 19 AND 20 OF THE NORTH CAROLINA CONSTITUTION AND CIVIL CONSPIRACY

(Against Holder and Munday in their official capacities and the City of Raleigh)

337. Mr. Blackmon incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

338. These claims are alleged only to the extent Plaintiff's state tort remedies are determined to be inadequate as a matter of law.

339. Acting under color of law, defendants acting individually and in concert, deprived Mr. Blackmon of his due process rights under Sections 19 and 20 of the North Carolina Constitution from October, 1983 until January, 2019, in the following ways:

> **Count VII** - Beginning in October, 1983 and continuing thereafter, defendants Holder and Munday conducted numerous interrogations of Mr. Blackmon in which they caused him to make false inculpatory statements and plead guilty to the murder of Helena Payton, as described in detail above.

74

> **Count VIII** – In October, 1983 defendants Holder and Munday caused the fabrication of evidence leading to the arrest, conviction, and incarceration of Mr. Blackmon in the absence of probable cause.

340.    Defendants' actions evidenced a reckless and callous disregard for, and deliberate indifference to, Mr. Blackmon's state constitutional rights.

341.    As a foreseeable result of defendants' conduct, Mr. Blackmon was held in custody for more than 35 years, and was thereby deprived of his due process rights guaranteed by Article I, Sections 19 and 20 of the North Carolina Constitution.

342.    As a direct and foreseeable consequence of these deprivations, Mr. Blackmon has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium, and loss of liberty in each year from December, 1983 until August 2019, as well as other damages to be determined at the trial of this matter.

## PUNITIVE DAMAGES

343.    Mr. Blackmon incorporates each paragraph of this Complaint as if fully restated herein and further alleges:

344.    The acts of defendants Holder and Munday as alleged above were willful and wanton as a matter of law, and evidenced a reckless disregard for and indifference to the rights and safety of the public, including James Blackmon, who as a result, spent more than 35 years in prison for a crime he did not commit.

345.    The willful and wanton acts alleged above proximately caused the injuries suffered by James Blackmon.  Blackmon is therefore entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff James Blackmon respectfully requests that the Court enter judgment in his favor against defendants on all counts of the Complaint, and award relief as follows:

1.     Compensatory damages against the defendants, jointly and severally, in an amount to be determined at trial;

2.     Punitive damages against the individual defendants, jointly and severally, in an amount to be determined at trial, in order that such award will deter similar prohibited behavior by defendants and other officials and law enforcement officers in the future;

3.     Pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 1920, against all defendants, jointly and severally, and

4.     Any and all other relief to which he may be entitled.

Respectfully submitted, this 5th day of October, 2020.


/s/ David S. Rudolf
David S. Rudolf, NCSB # 8587
Sonya Pfeiffer, NCSB # 37300
Rudolf Widenhouse
225 East Worthington Avenue
Charlotte, NC 28203
Telephone:   (704) 333-9945
Email: dsrudolf@rudolfwidenhouse.com
          spfeiffer@rudolfwidenhouse.com

ATTORNEYS FOR PLAINTIFF

76