**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil Action No. 5:20-CV-00524-FL**

|  |  |
|---|---|
| **JAMES BLACKMON, by and through his GUARDIAN OF THE ESTATE, PAUL TRUETT CANADY, II,** | |
| **Plaintiff,** | |
| **v.** | **DEFENDANT JAMES HOLDER'S** <br> **MEMORANDUM OF LAW IN** <br> **SUPPORT OF MOTION TO DISMISS** |
| **JAMES HOLDER, in his individual capacity, ANDREW MUNDAY, in his individual capacity, and THE CITY OF RALEIGH,** | |
| **Defendants.** | |

Pursuant to E.D.N.C. Local Civil Rules 7.1(e) and 7.2(a), Defendant James Holder, in his individual capacity (hereinafter, "Holder"), by and through counsel, submits this Memorandum of Law in support of his Motion to Dismiss. The Court should dismiss all of the claims alleged against Holder in Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## STATEMENT OF THE CASE

Plaintiff brings this lawsuit, in part, under 42 U.S.C. § 1983 claiming deprivation of his rights under the Fourth and Fourteenth Amendments in connection with his confession, alleged *Alford* guilty plea, and incarceration for a 1979 homicide at St. Augustine's College in Raleigh. Plaintiff also brings various tort and constitutional claims under North Carolina law. Specifically, Plaintiff purports to bring three § 1983 claims against Holder for violations of the Fourth and Fourteenth Amendments (see D.E. 1, ¶¶ 253-300—Counts I, II, III) as well as state

tort claims for "civil obstruction of justice and civil conspiracy" (see D.E. 1, ¶¶ 319-328—Count V) and negligence (see D.E. 1, ¶¶ 329-336—Count VI).

The gravamen of this lawsuit, as the Complaint readily discloses (D.E. 1, ¶¶ 253-345), is that Plaintiff seeks to revive his contention that his confession was coerced by Holder and Detective Andrew Munday (hereinafter, "Munday"), a contention which served as the basis for his alleged *Alford* guilty plea, and a contention for which he has already unsuccessfully availed himself fully of the North Carolina courts. *See State v. Blackman*, 93 N.C. App. 207, 377 S.E.2d 290 (1989).[1]

Even though a three judge panel at the North Carolina Innocence Inquiry Commission ("NCIIC") determined that Plaintiff met his evidentiary burden to have his conviction vacated, this does not retrospectively render his confession unconstitutionally coerced by Holder and Munday—and certainly not such that an objectively reasonable law enforcement officer would have understood as much in 1983. In any event, as detailed further below, Plaintiff's claims are barred by the statute of repose, the *Rooker-Feldman* doctrine, qualified immunity, the intracorporate conspiracy doctrine, the non-existence of any obstruction of justice claim, and, as to his state constitutional law claims, the existence of other adequate state law remedies.

## STATEMENT OF ALLEGED FACTS

In the interest of judicial economy, Holder relies on, and incorporates herein by reference, the "Statement of Facts" of the "Memorandum of Law in Support of Motion to Dismiss by Defendant Andrew Munday" (D.E. 24, pp. 2-4) and of the "Memorandum in Support

---

[1] In the caption of this case, Plaintiff's name is spelled 'Blackmon,' whereas the North Carolina Court of Appeals opinion is captioned 'Blackman.' While undersigned counsel will use Mr. Blackmon's name as presently captioned, when expressly citing to the Court of Appeals opinion, counsel will use the spelling used by the Court of Appeals.

of City of Raleigh's Motion to Dismiss" (D.E. 22, pp. 3-4). [2]

In addition to relying on the aforementioned fact statements, Holder draws the Court's attention to a few additional factual allegations contained in the Complaint. On October 25, 1983, "Holder and Munday drove Blackmon to St. Augustine's College." (D.E. 1, ¶ 155 (date); ¶ 173 (quoted material.) "When they arrived on the campus, Blackmon was allowed to walk around unescorted for about 35 minutes and at times out of the sight of the officers. During this time, Blackmon talked to several male and female students…" (D.E. 1, ¶ 175.) "The next day, October 26, 1983, Blackmon came to the police station in the morning to see Holder and Munday." (D.E. 1, ¶ 180.) On October 26, 1983, "Holder and Munday take Blackmon to the dorm where Helena Payton was attacked and allow him to wander around, particularly on the top floor." (D.E. 1, ¶ 190.)

## ARGUMENT

I.     **THE COURT SHOULD DISMISS PLAINTIFF'S COMPLAINT UNDER FED. R. CIV. P. 12(b)(6) BECAUSE ALL OF THE CLAIMS THEREIN ARE TIME-BARRED BY THE RELEVANT STATUTE OF REPOSE.**

All of Plaintiff's claims are violative of the applicable statute of repose in North Carolina and should thus be dismissed in accordance with Fed. R. Civ. P. 12(b)(6) and N.C. Gen. Stat § 1-52(16). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court, accepting the allegations in Plaintiff's Complaint as true and construing them in the light most favorable to the Plaintiff, must determine whether he states a plausible claim for relief. See *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 570 (2007)). The expiration of a claim's statute of repose must mean an "absolute ... bar" on a

---

[2] Detective Holder incorporates by reference the Statement of Facts as provided, but maintains his denial of the allegations in the Complaint, notwithstanding the court's obligation to consider them as true for the purpose of a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

defendant's temporal liability. *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014); *see also Lamb v. Wedgewood South Corp.,* 308 N.C. 419, 440–441, 302 S.E.2d 868, 880 (1983) ("A statute of repose creates an additional element of the claim itself which must be satisfied in order for the claim to be maintained.... If the action is not brought within the specified period, the plaintiff literally has *no* cause of action.").

### A. The personal injury statute of repose bars the state tort claims brought against Holder in his individual capacity.

In North Carolina, plaintiffs have three years to bring personal injury claims from the date that the "bodily harm … becomes apparent or ought reasonably to have become apparent to the claimant, whichever occurs first."  N.C. Gen. Stat. § 1-52(16).  However, North Carolina's concomitant ten-year statute of repose bears no relation to the date of discovery of the cause of action.  Rather, it refers to the "***the last act or omission*** of the defendant giving rise to the cause of action."  N.C. Gen. Stat. § 1-52(16).  (Emphasis added.)

> Unlike an ordinary statute of limitations which begins running upon accrual of the claim, the period contained in the statute of repose begins when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted.  Thus, the repose serves as an unyielding and absolute barrier that prevents a plaintiff's right of action even before his cause of action may accrue…

*Black v. Littlejohn*, 312 N.C. 626, 633, 325 S.E.2d 469, 474-75 (1985).

Thus, "[a] statute of repose… can prohibit a cause of action from ever coming into existence."  *CTS Corp.* 573 U.S. at 16.  Indeed, statutes of repose "will not be tolled for any reason."  *Id.*, at 10; *see, e.g., Christie v. Hartley Const. Inc.,* 367 N.C. 534, 539, 766 S.E.2d 283, 287 (2014) ("Because an applicable repose period begins to run automatically, statutes of repose give potential defendants a degree of certainty and control over their legal exposure…"); *Monson v. Paramount Homes, Inc.*, 133 N.C. App. 235, 240, 515 S.E.2d 445, 449 (1999)

("While equitable doctrines may toll statutes of limitations, they do not toll substantive rights created by statutes of repose.").

Accordingly, the state tort claims brought against Holder in his individual capacity—Counts V and VI of the Complaint—should be dismissed. Even if the applicable statute of limitations for Plaintiff's claims was tolled, which Holder denies, the statute of repose cannot be tolled. Under N.C. Gen. Stat § 1-52(16), the statute of repose expired in 1993, ten years after the alleged last acts or omissions of Holder that give rise to Plaintiff's claims- that is, the interviews of Plaintiff in 1983. Even giving Plaintiff the benefit of the doubt and using his January 14, 1988 guilty plea as the date of any alleged last act or omission of Holder results in the expiration of the statute of repose over two decades ago, in 1998. North Carolina's statute of repose also applies to the § 1983 claims against Holder (Counts I, II, and III of the Complaint) and they should likewise be dismissed.

**B.** **Section 1983 claims arising in North Carolina are barred by the State's personal injury statute of repose.**

There is no federal statute of limitations applicable to suits brought under § 1983, so it has become well-settled law that it "is borrowed from the analogous state statute of limitations." *See Nat'l Advertising Co. v. City of Raleigh*, 947 F.2d 1158, 1161 (4th Cir. 1991), *cert. denied*, 504 U.S. 931 (1992). It is equally well-settled that the appropriate statutory limitations period for § 1983 claims is the state statute of limitations applicable to personal injury claims. *Wilson v. Garcia*, 471 U.S. 261, 279 (1985). In North Carolina, N.C. Gen. Stat § 1-52(5) applies a three year statute of limitation to these claims. Understanding a slight, but significant, delineation made by *Nat'l Advertising* in "[t]he selection of the appropriate statutory limitations period" of three years is instructive on the issue of applying the North Carolina statute of repose to Plaintiff's federal claims. 947 F.2d at 1162.

The parties in *Nat'l Advertising* agreed that the relevant statute of limitations for § 1983 claims arising in North Carolina was three years under G.S. § 1-52(2)—"[u]pon a liability created by statute, either state or federal…". *See* 947 F.2d at 1162. The court agreed that the statutory limitations period was three years, but took care to "find that this limitations period is supplied by [G.S.] § 1-52(5), *relating to personal injury actions*…" 947 F.2d at 1162. (Emphasis added.) The court clarified that the U.S. Supreme Court had effectively overruled the Fourth Circuit case law relied upon by the parties to arrive at that conclusion. *See id.*, at 1162 (n. 2). Relative to when *Nat'l Advertising* was decided, the Supreme Court had recently held that the legislative history of § 1983 required that "where state law provides multiple statutes of limitations for personal actions, courts considering § 1983 claims should borrow the general or residual statute for personal injury actions." *Owens v. Okure*, 488 U.S. 235, 249-50 (1989).

While the court's change of the particular enumerated paragraph under G.S. § 1-52 made no difference to the limitations *period* applied to the federal claims in *Nat'l Advertising*, the court's careful shifting of the statute of limitations applied to § 1983 actions arising in North Carolina to the "general or residual statute for personal injury actions" was nonetheless significant and ought to apply with equal force to the personal injury statute of repose at § 1-52(16).[3]

Importantly, § 1-52(16) not only includes the State's statute of repose for personal injury actions; it also includes a discovery rule for claim accrual purposes for the personal injury statute of limitations at § 1-52(5). In this manner, § 1-52 creates two bookends for the temporal life of a personal injury claim in North Carolina: one allowing the claim to spring forth through the plaintiff's own diligence, or lack thereof, and one terminating the claim's existence based on the

---

[3] At the time *Nat'l Advertising* was decided, the discovery rule and the statute of repose found at G.S. § 1-52(16) had been law for twelve years. *See*, N.C. Sess. Law 1979-654, § 3(b).

timing of the defendant's conduct- that is, his "last act or omission." Section 1-52(5) and its sister provision, § 1-52(16), work in tandem to recognize, on the one hand, the plaintiff's interest in discovering and pursuing his claim while also protecting, on the other hand, the defendant against the prospect of defending stale claims where, inevitably, memories have faded, witnesses have moved away to parts unknown or have passed away and physical and documentary evidence have been lost.

Severing the statute of repose from the statute of limitations in N.C. Gen. Stat. § 1-52 upsets the dualistic balance struck by the State's legislature for personal injury actions. Applying the statute of limitations but no statute of repose could lead to absurd results, where a plaintiff discovers his claim at such a late date that the defendant has no method of defending against it due to the loss of witnesses and other evidence. Indeed, in this case, Plaintiff's Complaint specifically acknowledges a potentially important evidentiary deficit in that Detective Lockey, a participant in the investigation and ostensibly the possessor of important information, "passed away some unknown number of years ago." (See, e.g., D.E. 1, ¶ 96. N.3.)

At a minimum, even if this Court was reticent to apply the ten-year personal injury statute of repose to Plaintiff's federal claims, it should apply a period of repose. Since Congress was silent in § 1983 on the applicable statute of repose, this Court looks to North Carolina, the forum state. *Burnett v. Grattan*, 468 U.S. 42, 47-8 (1984). Undersigned counsel's research has yielded no statute of repose in North Carolina longer than the twelve year period for products liability claims at N.C. Gen. Stat. § 1-46.1. Whether the Court applies the ten-year period established for personal injury actions, or the longest North Carolina statute of repose of twelve years, Plaintiff's claim is still untimely, by at least two decades.

Importantly, statutes of repose are not a merely a state law concern. Federal courts,

including the United States Supreme Court, have long recognized the importance of the concept of repose, which is embodied in § 1-52(16). *See Wallace v. Kato*, 549 U.S. 384, 391 (2007); *Wilson v. Garcia*, 471 U.S. 261, 271 (1985); and *Bd. of Regents of Univ. of State of N. Y. v. Tomanio*, 446 U.S. 478, 488 (1980).

Plaintiff's Complaint cannot justly be adjudicated thirty-seven years after the occurrence of the alleged events which give rise to his claims. As a result, the § 1983 claims against Holder in his individual capacity—Counts I, II, and III of the Complaint—are as time-barred by the statute of repose contained in G.S. § 1-52(16) as, again, the state law claims brought against Holder in his individual capacity—Counts V-VI. Accordingly, all claims brought against Holder should be dismissed with prejudice.

## II.   THIS COURT LACKS SUBJECT MATTER JURISDICTION TO CONCLUDE THAT PLAINTIFF'S CONFESSION WAS COERCED WHERE THE NORTH CAROLINA COURT OF APPEALS CONCLUDED OTHERWISE.

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court should dismiss a Complaint if the Court lacks Subject Matter Jurisdiction. Fed. R. Civ. P 12(b)(1). The burden to prove jurisdiction is on the Plaintiff. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). In determining whether the Court has jurisdiction, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

The *Rooker-Feldman* doctrine represents a tenet of federalism which holds that the only forum for "appellate review of state court decisions [is] first within the state appellate system and then in the United States Supreme Court." *Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 316 (4th Cir. 2003); *Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997) ("Under the *Rooker–*

*Feldman* doctrine, lower federal courts do not have jurisdiction to review state-court decisions.").

The *Rooker-Feldman* doctrine mandates that federal district courts lack jurisdiction to entertain challenges "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *applying and altering the scope of Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). "The [*Rooker-Feldman*] doctrine extends not only to constitutional claims presented or adjudicated by the state courts but also to claims that are 'inextricably intertwined' with a state court judgment." *Jordahl v. Democratic Party*, 122 F.3d 192, 199 (4th Cir. 1997) (internal citations omitted). If federal claims fall under the scope of the *Rooker-Feldman* doctrine, the federal district court lacks subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1). Given that Plaintiff's § 1983 claims are 'inextricably intertwined' with a published opinion of the North Carolina Court of Appeals rejecting the substance of those claims, they should be dismissed.

Plaintiff contends that his confession was unconstitutionally coerced by Holder and Munday and, on that basis, seeks relief from this Court. The rationale for this relief is summarized by six paragraphs in the 345-paragraph Complaint:

> 149. By 1983 it was well known to law enforcement that mentally ill people and people with intellectual disabilities… were highly suggestible and prone to making unreliable and false statements under police questioning.

> 150. Upon information and belief, Holder and Munday knew, or reasonably should have known this about people with severe mental illness and profound intellectual disabilities.

151.    Despite this, Holder and Munday deliberately and intentionally used Blackmon's mental illness and delusions to fabricate a false confession to the murder of Helena Payton.

(…)

228.    On December 8, 1986, Blackmon's attorney… filed a motion to suppress the statements obtained by Holder and Munday.  A supplement to that motion was filed on August 17, 1987.  That motion was denied on August 31, 1987.

(…)

231.    [Blackmon's attorney] advised Blackmon to accept the state's offer to plead guilty to second degree murder… He also advised Blackmon that ***he would preserve for appeal the admissibility of the statements obtained by Holder and Munday.***

(…)

233.    …A guilty plea was entered pursuant to <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970)…

(D.E. 1.) (Emphasis added.)

The product of that appeal is published at *State v. Blackman*, 93 N.C. App. 207, 377 S.E.2d 290 (1989).  In that opinion, the North Carolina Court of Appeals directly addressed whether "use of [Plaintiff's] psychiatric history to guide their interrogative tactics constituted coercion" in obtaining his confession.  *Blackman*, 93 N.C. App. at 211.  "We reject this contention." *Id.*

"The *Rooker-Feldman* doctrine divests the district court of jurisdiction where entertaining the federal claim should be the equivalent of an appellate review of the state court order." *Jordahl*, 122 F.3d at 202.  The NCIIC did not make any conclusions which affect the validity of the Court of Appeals decision that the Plaintiff's confession was *not* coerced and Plaintiff does not allege that it did. Rather, Plaintiff alleges that he met the evidentiary burden required to "merit judicial review" and, thereafter, the three-judge panel "concluded that Mr. Blackmon had

proven by clear and convincing evidence that he was factually innocent of Helena Payton's murder." (D.E. 1, ¶ 8-9.) The NCIIC's determination led to Plaintiff's conviction being overturned, but that does not equate to a finding that the confession was unconstitutionally coerced. Yet, to fasten liability to Holder and Munday, Plaintiff asks the Court to reach just that conclusion. The Court should decline that invitation and dismiss Plaintiff's § 1983 claims against Holder.

Finally, the *Rooker-Feldman* doctrine applies to Plaintiff's claim even though his conviction has been vacated. *See Jordahl v. Democratic Party of Virginia*, 122 F.3d 192 (4th Cir. 1997). In *Jordahl*, the plaintiff argued that the overturning of the state-issued injunctions, which were the basis of his § 1983 claims, made the *Rooker-Feldman* doctrine inapplicable because there were no valid state claims left to "review." *Id.* This argument was rejected and his § 1983 claim for damages were dismissed for violation of the *Rooker-Feldman* doctrine. *Id.* at 202. The plaintiff's:

> "attempt to narrow application of the doctrine to apply only in circumstances where a state court decision is still subject to reversal or modification is untenable. The fact that the [state court decision is]… no longer presently in effect does not alter the analysis under *Rooker–Feldman.*"

*Id.*; *See also Bechtold v. City of Rosemount,* 104 F.3d 1062, 1065 (8th Cir. 1997) ("[a] litigant cannot circumvent *Rooker–Feldman* by recasting his or her lawsuit as a § 1983 action").

The *Rooker–Feldman* doctrine applies to cases that meet the elements even if the state court has vacated or modified the judgment or decision that caused the effects complained of in the claim. Plaintiff's federal claims are no exception and this Court should dismiss them.

## III. HOLDER IS ENTITLED TO QUALIFIED IMMUNITY FROM THE § 1983 CLAIMS BROUGHT AGAINST HIM IN HIS INDIVIDUAL CAPACITY.

Even if Plaintiff's federal claims under § 1983 are properly before the Court, Holder is entitled to qualified immunity from those claims brought against him in his individual capacity.

To overcome qualified immunity from § 1983 claims, a plaintiff must prove that a governmental official, acting under color of law, "violate[d] [the plaintiff's] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "For a right to be 'clearly established,' in a qualified immunity case, 'the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'" *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013), *quoting*, *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

According to the Fourth Circuit, case law from itself, the U.S. Supreme Court, or the relevant state's supreme court—*i.e.*, in this case, the North Carolina Supreme Court—is determinative of whether a right is clearly established. *Hill*, 727 F.3d at 322.

A. **Defining the right at the appropriate level of specificity involves accounting for the totality of the circumstances confronting Holder.**

While Plaintiff's detailed Complaint invites the reader to retrospectively ban the police methods alleged there, the state of the law in 1983 disagrees. Confession jurisprudence was far less settled in 1983 than the Complaint's various legal conclusions, arguments, and characterizations of the factual allegations imply. (*See*, *e.g.*, D.E. 1, ¶ 149.) [4]

For a confession to be coercive in the constitutional sense, the suspect's will must have been "overborne and his capacity for self-determination critically impaired…". *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). Factors "[i]n determining whether a defendant's will was overborne in a particular case" include the totality of the circumstances of "both the characteristics of the accused and the details of the interrogation." *Id.*, at 226. Thus, appropriately applying qualified immunity to the facts alleged in the Complaint involves

---

[4] Plaintiff's characterizations of the factual allegations are also not entitled to this Court's deference on a Rule 12(b)(6) motion. *See Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014) ("[W]e are not obliged [at Rule 12(b)(6) or Rule 12(c)] to accept allegations that represent unwarranted inferences, unreasonable conclusions, or arguments…")

examining whether an objectively reasonable officer in October 1983 would have understood—based on the clearly established law of the day—that the alleged police methods used to obtain Plaintiff's confession violated his constitutional rights.

As discussed further below, the facts pled in the Complaint itself and the adjudicative facts contained in the North Carolina Court of Appeals' opinion in *Blackman*, demonstrate that an objectively reasonable officer in 1983 would not have recognized the police methods employed by Holder as unconstitutionally coercive on a person fitting Plaintiff's psychiatric profile. Accordingly, Holder must be entitled to qualified immunity from the § 1983 claims brought against him in his individual capacity.

### B. In 1989, the N.C. Court of Appeals specifically held that the officers' methods in 1983 were not unconstitutionally coercive.

As discussed in the *Rooker-Feldman* section of this brief, Plaintiff contends that his confession was unconstitutionally coerced by Holder and Munday and, on that basis, seeks relief from this Court. Plaintiff specifically contends that "[b]y 1983 it was well known to law enforcement that mentally ill people with intellectual disabilities (referred to at the time as "mental retardation") were highly suggestible and prone to making unreliable and false statements under police questioning." (D.E. 1, ¶ 149.) This non-factual legal conclusion is not entitled to deference by this Court, nor does it adequately summarize the state of the law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions… we are not bound to accept as true a legal conclusion couched as a factual allegation.")

Indeed, in its opinion, the North Carolina Court of Appeals directly addressed whether, as a matter of law, the "use of [Plaintiff's] psychiatric history to guide their interrogative tactics

constituted coercion" in obtaining his confession. 93 N.C. App. at 211.[5]  The Court of Appeals summarized the totality of the circumstances surrounding the details of the interviews with Plaintiff as thus:

> We reject this contention.  Holder and Munday clearly ingratiated themselves with defendant and presented themselves as his friends.  We are not prepared to hold, however, that simply because the police adopt a strategy for the dealings with a suspect that that strategy is therefore coercive.  At no time did these detectives force defendant to submit to any of the ordeals traditionally associated with coercive interrogations… We hold, therefore, that the interviews in which defendant participated with Holder and Munday were not coercive…

*Id.*, at 211-12.

Thus, if an appellate court of law in 1989 did not hold Holder and Munday's conduct to be unconstitutionally coercive, then how could a reasonable law enforcement officer six years earlier be said to have understood that *same conduct* to be unconstitutionally coercive?  The answer is that the reasonable officer would not have had that understanding, and it is unreasonable, thirty-seven years later, to retroactively foist that expectation on Holder and Munday.

Likewise, Holder and Munday are not alleged in the Complaint to have had any special ability to assess Plaintiff's competency. The Court of Appeals addressed Plaintiff's putative incompetency at the time he confessed, by summarizing evidence before the trial judge, and

---

[5] In addition to moving to dismiss the Complaint, Holder asks the Court to take judicial notice of the underlying Court of Appeals opinion. While the Court is generally confined to the four corners of the Complaint in considering this Rule 12(b)(6) motion to dismiss, this restriction does not apply to matters of public record of which the Court may take judicial notice, even if those matters contradict the factual allegations contained in the Complaint. *See,* Walker v. Kelly, 589 F.3d 127, 139 (4th Cir. 2009).  ("[A] federal court may consider matters of public record *such as documents from prior state court proceedings* in conjunction with a Rule 12(b)(6) motion," without having to convert the motion into one for summary judgment.) (Emphasis added.)  In other words, it is neither Holder's intent nor request to convert this motion to one for summary judgment by asking the Court to take judicial notice of the Court of Appeals decision in the underlying criminal matter.

therefore capturing the totality of the circumstances presented to Holder and Munday on the characteristics of the accused:

> In our view, some of the medical and other evidence in this case would support that this defendant was not competent when he spoke with the detectives. At the same time, other competent evidence in this record points to the opposite conclusion. Conflicting evidence does not vitiate the conclusive and binding effect of the trial judge's findings on the appellate court.

92 N.C. App. at 213.

Whether this Court agrees with the Court of Appeals or the trial judge—or, for that matter, the forensic psychiatrist who testified for the State—is not the object of this argument. However, if a trial court judge ruled that Plaintiff was competent to confess to Holder and Munday, based on the expert testimony and professional opinion of a forensic psychiatrist, and then an appellate court three-judge panel affirmed the competency determination—how could two police officers in 1983 be expected to have arrived at any different conclusion? Worse, how could these two police officers be held individually liable almost four decades later for conduct that was endorsed by a trial court and an appellate court of that time?

For purposes of qualified immunity, had the Court of Appeals been bound by authority in either the United States Supreme Court or the North Carolina Supreme Court, then it would have reached the contrary conclusion. At a minimum, Plaintiff would have sought discretionary review to the North Carolina Supreme Court and certiorari to the United States Supreme Court, if necessary. There simply was no such contrary authority directing the Court of Appeals in 1989 and certainly none directing Holder and Munday in 1983.

**C.**     **In 1986, the U.S. Supreme Court in *Colorado v. Connelly* held that a confession was voluntary even where a suspect suffered from schizophrenia.**

Indeed, in 1986—three years after the complained of conduct at bar—the U.S. Supreme Court addressed a case that is substantially similar in many ways to the *allegations* contained in

this Complaint. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In *Connelly*, the Court concluded that a confession was voluntary where a suspect suffering from schizophrenia confessed to a murder. *Id.*, at 160-62.

Connelly's confession occurred on August 18, 1983. *Id.*, at 160. Connelly had driven from Boston to Denver to confess that he had murdered a woman in November 1982. He also "pointed out the exact location of the murder" to the interrogating officers. *Id.* at 160-61. The morning following his confession, however, "he became visibly disoriented" in the public defender's office, gave "confused answers to questions, and for the first time, stated that 'voices' had told him to travel to Denver and that he had followed the directions of these voices in confessing." *Id.*, at 161. He was admitted to a state psychiatric hospital and "initially found incompetent to assist in his own defense." *Id.*

After subsequently being found to be competent to stand trial, he moved to suppress his confession. At the evidentiary hearing on that motion, a psychiatrist for the State testified that his interviews with Connelly "revealed that respondent was following the 'voice of God.' *Id.* The State's psychiatrist also "testified that Connelly's illness did not significantly impair his cognitive abilities," "the 'voices' could in reality be Connelly's interpretation of his own guilt," but that "Connelly's psychosis motivated his confession." *Id.*, at 161-62. In dissent, Justice Brennan cites to the record on appeal, noting that officers knew of Connelly's mental illness when they obtained the confession from him. *Id.*, at 180 (n.3) (J. Brennan, dissenting).

After the Colorado trial court excluded the confession on the grounds that it was involuntarily given and the Colorado Supreme Court affirmed, the U.S. Supreme Court reversed, holding "that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Id.* at 167. "Respondent's

perception of coercion flowing from the 'voice of God,' [*i.e.*, internal mental influences on the suspect] however important or significant such a perception may be in other disciplines, is a matter to which the United States Constitution does not speak." *Id.* at 170-71.

Importantly, the N.C. Court of Appeals in *Blackman* explicitly cites to *Connelly* in introducing its discussion on coercion: "We begin by noting that, absent police coercion, there is no federal due process ground for finding that a confession is involuntary." 93 N.C. App. 207, 211, *quoting Connelly*, 479 U.S. 157, 167. Thus, when the N.C. Court of Appeals concluded that Holder and Munday had not acted in a coercive manner *and* that Plaintiff was *not* incompetent at the time of his confession, it did so with the benefit of, and relying on, *Connelly*.

### D. In 2004, a district court in the Fourth Circuit concluded that officers in 1983 would have no reason to know that asking leading questions to a suspect of limited mental faculties could be unconstitutional.

Basing its opinion on *Connelly*, a sister district court has already concluded that an objectively reasonable police officer in 1983 would have concluded that asking leading questions to a mentally disabled individual was <u>not</u> unconstitutional. *See Washington v. Buraker*, 322 F.Supp.2d 702, 715 (W.D. Va. 2004). There, the court held that "[e]ven if [the interrogating officers] knew Washington was mentally disabled, an officer questioning a suspect of below normal intelligence can reasonably believe that such questioning is constitutional." *Id.*, at 714. This questioning involved the use of leading, suggestive questions, just as has been alleged in the Complaint. *Id.*

As referenced *supra* in subsection B of this argument, the *Blackman* court states that Plaintiff was not "force[d]… to submit to any of the ordeals traditionally associated with coercive interrogations." 92 N.C. App. at 211. The *Washington* court specifies examples of these "ordeals" from 1983:

Even assuming that the evidence is sufficient to establish that Washington is mentally retarded, had been drinking prior to the Weeks assault, and had not slept the night on May 20, 1983 [*i.e.*, the night before his confession], the record is insufficient to establish constitutional liability in this case. The police in this case did not cause any of the conditions that Washington complains created a coerced confession. Washington was warned of his Miranda rights before the interrogation began. There is no evidence that Washington suffered physical or psychological abuse at the hands of the interrogating officers. To the contrary, there is evidence that Washington was not made any promises during his interview in exchange for his confession… that night… no one disturbed his sleep. Additionally, there is evidence that Washington was allowed to use the bathroom, was given a drink when he asked for one, was given a cigarette, and was allowed to eat lunch.

322 F.Supp.2d at 714.

Though the Complaint repeatedly characterizes the subject confession as the result of an "interrogation," it is important to note that Plaintiff was not in custody during these interviews as noted by the Court of Appeals in *Blackman*:

The judge concluded as a matter of law that Holder and Munday never subjected defendant to a custodial interrogation prior to his arrest [*i.e.*, on December 7, 1983]. The judge based this conclusion on his finding of fact that 'during all interviews [d]efendant was free to come and go as he pleased and asked for and received breaks to get coffee or go to the bathroom unescorted.' The detectives took pains, moreover, to ask defendant, on tape, such questions such as 'Nobody is forcing you to stay here, [are] they?" Defendant typically answered that he had come to the station and was talking to the police 'on his own will.' Defendant, on several occasions, telephoned Holder and Munday and, on his own, came to the station to talk with them… [N]one of the interview sessions was of long duration, that Holder and Munday dressed in civilian clothing, and that they did not expose their weapons to defendant. ***In our view, a reasonable person in defendant's position would not have believed he was in police custody.***

93 N.C. App. at 210-11. (Emphasis added.)

While the Complaint omits the above details and, again, repeatedly uses the word "interrogation" to characterize Holder and Munday's interaction with Plaintiff, other critical factual allegations in the Complaint actually buttress the conclusion that he was not in custody. (*See*, *e.g.* D.E. 1, ¶ 175 ("When they arrived on the campus, Blackmon was allowed to walk around unescorted for about 35 minutes and at times out of the sight of the officers. During this

time, Blackmon talked to several male and female students…"); ¶ 180 ("The next day, October 26, 1983, Blackmon came to the police station in the morning to see Holder and Munday."); ¶ 190 ("During the next two hours, Holder and Munday take Blackmon to the dorm where Helena Payton was attacked and allow him to wander around, particularly on the top floor…").

This Court is confronted with much the same question as the *Washington* court and that court reached the conclusion that the interrogating officers were entitled to qualified immunity on the coercion claim made against them:

> Washington's coercion claim against Wilmore and Hart must rely on the claim that ***interrogating officers asked a mentally retarded man leading questions***… Even if there were evidence sufficient to support Washington's coercion claim, the Court finds that a reasonable officer in the position of Schrum, Zeets, Wilmore or Hart at the time of the Washington interrogation in 1983 would not have thought that the interrogating officers' actions were unconstitutional.

322 F.Supp.2d at 714. (Emphasis added.)

As such, Plaintiff's coercion claim here should fail as a matter of law because, even accepting Plaintiff's allegations of fact as true, reasonable officers in the position of Holder and Munday in 1983 would not have thought that asking Plaintiff leading, or suggestive, questions in his alleged mental state was unconstitutional, particularly given that he was never in custody during the alleged encounters and, as the Complaint points out, was for example, allowed to wander freely around the crime scene.

Based on the foregoing, there is simply no case law from the U.S. Supreme Court, the Fourth Circuit, or the North Carolina Supreme Court that, on the totality of the circumstances, would have placed Holder and Munday on notice in 1983 that they were violating Plaintiff's constitutional rights when he confessed to the murder of Helena Payton during their interview and encounters with him. Therefore, all claims brought against Holder in his individual capacity should be dismissed with prejudice.

**IV.   PLAINTIFF'S "CIVIL OBSTRUCTION OF JUSTICE AND CIVIL CONSPIRACY CLAIM" IS, ON THE ONE HAND, A NON-COGNIZABLE CLAIM AND, ON THE OTHER HAND, BARRED BY THE INTRACORPORATE CONSPIRACY DOCTRINE.**

In the interest of judicial economy, Holder adopts and incorporates herein by reference Section IV of the Argument in "Memorandum of Law in Support of Motion to Dismiss by Defendant Andrew Munday."   (D.E. 24, pp. 14-16) and Section III of the Argument in "Memorandum in Support of City of Raleigh's Motion to Dismiss". (D.E. 22, pp. 11-12).  There is no private cause of action for civil obstruction of justice, and as to "civil conspiracy," the intracorporate conspiracy doctrine clearly applies.

**V.   PLAINTIFF'S CLAIMS BROUGHT DIRECTLY UNDER THE NORTH CAROLINA CONSTITUTION SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS ADEQUATE REMEDIES AT STATE LAW.**

In the interest of judicial economy, Holder adopts and incorporates herein by reference Section V of the Argument in "Memorandum of Law in Support of Motion to Dismiss by Defendant Andrew Munday"   (D.E. 24 Pgs. 16-18) and Section II of the Argument in "Memorandum in Support of City of Raleigh's Motion to Dismiss" (D.E. 22, pp. 9-11). Moreover, purporting to bring this claim against Holder in his official capacity when the City of Raleigh is already a named party is duplicative.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). ("Official-capacity suits… generally represent only another way of pleading an action against an entity of which an officer is an agent… It is not a suit against the official personally, for the real party in interest is the entity.")

## CONCLUSION

Based on the foregoing reasons and authorities, Defendant James Holder, in his individual capacity, respectfully requests that this Court dismiss with prejudice Plaintiff's Complaint and Demand for Jury Trial.

Respectfully submitted, this the 23rd day of December, 2020.

/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710
Daniel E. Peterson
N.C. State Bar No. 41251
PARKER POE ADAMS & BERNSTEIN LLP
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile:  (704) 334.4706
Email: jasonbenton@parkerpoe.com
        danielpeterson@parkerpoe.com

*Attorneys for Defendant James Holder*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on this date, the foregoing **Defendant James Holder's Memorandum of Law in Support of Motion to Dismiss** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification and serve same upon counsel of record via the Court's electronic case filing system.

Sonya Pfeiffer
David S. Rudolf
RUDOLF WIDENHOUSE
225 E. Worthington Avenue, Suite 100
Charlotte, NC 28203
Email: spfeiffer@rudolfwidenhouse.com
Email: dsrudolf@rudolfwidenhouse.com

*Counsel for Plaintiff*

Rachel E. Keen
Sonny S. Haynes
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Email: rachel.keen@wbd-us.com
Email: sonny.haynes@wbd-us.com

*Counsel for Defendant Andrew Munday*

Dorothy V. Kibler
CITY OF RALEIGH ATTORNEY'S OFFICE
P.O. Box 590
Raleigh, NC 27602
Email: dorothy.kibler@raleighnc.gov

Norwood P. Blanchard, III
CROSSLEY MCINTOSH COLLIER HANLEY & EDES, PLLC
5002 Randall Parkway
Wilmington, NC 28403
Email: norwood@cmclawfirm.com

*Counsel for Defendant City of Raleigh*

This the 23rd day of December, 2020.

/s/ Jason R. Benton
Jason R. Benton
N.C. State Bar No. 27710
Daniel E. Peterson
N.C. State Bar No. 41251
PARKER POE ADAMS & BERNSTEIN LLP
Bank of America Tower
620 S. Tryon St., Suite 800
Charlotte, NC 28202
Telephone: (704) 372.9000
Facsimile:  (704) 334.4706
Email: jasonbenton@parkerpoe.com
            danielpeterson@parkerpoe.com

*Attorneys for Defendant James Holder*